Morton H. HALPERIN et al., Plaintiffs,

v.

Henry A. KISSINGER et al., Defendants.

Civ. A. 1187–73.

United States District Court,
District of Columbia.

Dec. 16, 1976.

Walter B. Slocombe, Washington, D. C., John H. F. Shattuck, Leon Friedman, New York City, Charles R. Nesson, Cambridge, Mass., for plaintiffs.

Edward S. Christenbury, D. Jeffrey Hirschberg, Elizabeth Gere Whitaker, Dept. of Justice, Washington, D. C., for defendants.

## OPINION

JOHN LEWIS SMITH, Jr., District Judge.

This action under the First, Fourth, Fifth, and Ninth Amendments to the Constitution and under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (Title III), seeks declaratory and injunctive relief and money damages for defendants' allegedly illegal wiretapping of plaintiffs' home telephone. Plaintiffs are Morton H. Halperin, a former Chief of the National Security Council Planning Group, his wife Ina, and their three minor children. Defendants are Henry A. Kissinger, Richard M. Nixon, John N. Mitchell, H. R. Haldeman, Alexander M. Haig, William C. Sullivan, Robert C. Mardi-

an, Clarence Kelley and Jeb Stuart Magruder (hereinafter cited as federal defendants), John Ehrlichman, and the Chesapeake and Potomac Telephone Company (C&P). The matter is before the Court on plaintiffs' Motion for Summary Judgment against the federal defendants and Motion for Partial Summary Judgment against defendant C&P, federal defendants' Motion for Summary Judgment, defendant Ehrlichman's Motion for Summary Judgment, defendant C&P's Motion for Summary Judgment, and defendant Nixon's Motion to Dismiss.

I

Many of the central facts in this case are undisputed and can be recounted briefly. Between February and April of 1969, Nixon Administration officials grew increasingly concerned about leaks to the press of certain foreign policy documents and classified information. The leaks related to United States policies in Vietnam, China, the Soviet Union, Europe, and the Mideast. In late April 1969, President Nixon, Attorney General Mitchell, National Security Affairs Advisor Kissinger, and FBI Director Hoover met to discuss the problems of leaks and to formulate a plan for stopping unauthorized disclosures. After receiving the Attorney General's legal opinion on the matter and assurances from the FBI Director about previous Executive practice, President Nixon authorized a program of electronic surveillance of individuals suspected of leaking information detrimental to the national defense and foreign policy of the United States. Those to be wiretapped would be selected on the basis of access to information leaked, material in security files, and evidence developed as the surveillance proceeded.

On May 9, 1969, following the appearance of an article in the *New York Times* concerning United States B–52 bombing raids in Cambodia, wiretaps were requested upon four individuals, including plaintiff Halperin. The names were provided by Dr. Kissinger and were transmitted by Colonel Haig to the Assistant Director of the FBI's Domestic Intelligence Division, William Sul-

livan. Three days later, Attorney General Mitchell gave his authorization for the wiretap of the Halperin home telephone.[1] This wiretap remained in effect approximately twenty-one months.

During this period FBI agents monitored telephone communications and prepared logs of many of the conversations. Letters summarizing some of the discussions were prepared and forwarded to FBI Director Hoover for transmittal to the President (through Presidential Counsel Ehrlichman) and to Dr. Kissinger (through Colonel Haig). On occasion, summaries of interceptions were also sent to Attorney General Mitchell. After May 1970, the FBI's summary letters were sent only to Presidential Assistant Haldeman, who was to screen the letters for relevant information. On February 10, 1971, the Halperin wiretap was removed.

Subsequently, after discussions involving Mr. Sullivan, Assistant Attorney General Mardian, President Nixon, and Mr. Ehrlichman concerning disposition of the wiretap documents, the records were taken from the FBI's custody and placed in a safe in Ehrlichman's White House office. Failure to produce the documents resulted in the dismissal of a criminal case involving the Pentagon Papers, *United States v. Russo and Ellsburg*, No. 9373 (C.D.Cal., Order of May 11, 1973). On May 12, 1973, the Halperin

wiretap records were recovered from Ehrlichman's safe and returned to the FBI. Plaintiffs filed this action on June 14, 1973.

## II

### A

A threshold question confronting the Court is the applicability to this action of Title III's procedures and remedies for electronic surveillance. Although this statutory scheme was in effect during 1969–1971 when defendants' wiretapping activities occurred, the legality of warrantless national security wiretaps has been considered only in subsequent judicial decisions. *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975); cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976).[2] The *Keith* case held that, "[N]othing in [18 U.S.C.] § 2511(3)[3] was intended to *expand* or to *contract* or to *define* whatever presidential surveillance powers existed in matters affecting the national security." 407 U.S. at 308, 92 S.Ct. at 2132. (Emphasis in original.) The Supreme Court in *Keith* proceeded to hold the challenged wiretaps invalid under the Fourth Amendment but did not resolve their legality under Title III. *Compare id.* 407 U.S. at 335–44, 92 S.Ct. 2125 (White, J., concurring in judgment).

1. Interceptions and monitoring of the Halperin home telephone began on the evening of May 9, 1969. The Halperin wiretap was one of 17 wiretaps instituted against 13 government officials and four newsmen between May 1969 and February 1971. All of these individuals were suspected of leaking or receiving classified government documents.

2. *See generally United States v. Ehrlichman*, 546 F.2d 910 (D.C.Cir. 1976) cert. denied —— U.S. ——, 97 S.Ct. 1155, 51 L.Ed.2d —— (1977); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 157–59 (D.D.C.1976).

3. The statute provides: "Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a

foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. *Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.* The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power." (Emphasis supplied).

In *Zweibon*, the Court of Appeals for this Circuit stated that, ". . . Congress intended that applicability of Title III procedures and remedies in the national security context be contingent upon further judicial pronouncements concerning the constitutional [requirements of national security wiretaps], since Section 2511(3) expressly declined to restrict 'constitutional' Executive surveillance." 516 F.2d at 671. *Zweibon* also pronounced that a warrant—and full compliance with Title III's procedural protections, e. g., 18 U.S.C. §§ 2518–20—are necessary for wiretaps upon a domestic group lacking a relationship with a foreign power. 516 F.2d at 614, 663–70.[4] However, the Court left for remand defendants' contention that the *Keith* and *Zweibon* holdings should not be applied retroactively in a damage suit based upon pre-*Keith* and pre-*Zweibon* surveillance. *Id.* at 607 n. 18.

Having reviewed the entire record in this case, including the extensive depositions and answers to interrogatories, the Court holds as a matter of law that defendants have made out a sufficient good faith defense against the retroactive application of *Keith* and *Zweibon.* Without engaging in an exhaustive analysis of legislative history or of pre-*Keith* decisions, the Court notes the indisputable difficulties and ambiguities presented by § 2511(3). Interpretation of this statute and of the President's domestic power thereunder troubled legislators, law enforcement personnel, and courts until the *Keith* decision, when the Supreme Court ruled that the statute was merely a disclaimer of intent to limit constitutionally proper Executive actions. Thus, at least

until 1972, and perhaps until the 1975 *Zweibon* decision, see *Keith, supra,* 407 U.S. at 309 n. 8, 92 S.Ct. 2125, the meaning and the limits of § 2511(3) were open issues.

Defendants should not be held to have acted at their peril in this vacuum. In view of the confused state of the law and the 30-year history of similar Executive actions, see *Keith, supra,* 407 U.S. at 310–11, 92 S.Ct. 2125; *Zweibon, supra,* 516 F.2d at 616–19, the Court finds that defendants' determination that Title III was inapplicable to the Halperin wiretap was reasonable during the period of surveillance. The Court further finds no genuine issue of fact in the record controverting this good faith belief on defendants' part. *See Scheuer v. Rhodes,* 416 U.S. 232, 242–50, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Apton v. Kuhn,* 165 U.S.App.D.C. 22, 506 F.2d 83, 91–94 (1974); see also *Chevron Oil Co. v. Huson,* 404 U.S. 97, 105–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (standards for nonretroactivity); *Morales v. Hamilton,* 391 F.Supp. 85, 89–91 (D.Ariz.1975). Accordingly, plaintiffs have no cause of action under Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

**B**

▮ The compatibility of the wiretap with the Fourth Amendment is a different matter.[5] Assuming *arguendo* the inapplicability of the warrant provision, *cf. Keith, supra; Katz v. United States,* 389 U.S. 347, 358 n. 23, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), there can be no serious contention that the Fourth Amendment's independent requirement of reasonableness is suspended

---

4. Despite federal defendants' eleventh hour argument, there is no evidence in the record that this case involved a "foreign surveillance." The *Zweibon* decision carefully delineated the difference between foreign and domestic surveillance and rejected outright any open-ended rationale, such as "national security" or conduct "affecting foreign relations," to justify warrantless surveillance. 516 F.2d at 651–55; see also *Keith, supra,* 407 U.S. at 309 n. 8, 92 S.Ct. 2125.

Congress has recently considered the hitherto uncharted and unregulated area of foreign surveillance. S. 3197, as reported, defines for-

eign intelligence surveillance and contains special procedures for obtaining a judicial warrant prior to any such surveillance. *See* S.Reps. Nos. 1035, 1161 94th Cong., 2d Sess. (1976).

5. The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

in the area of national security searches and seizures. In other words, even if § 2511(3) and prior presidential practice could be invoked to authorize warrantless wiretaps, national security surveillance still must be "exercised in a manner compatible with the Fourth Amendment." *Keith, supra,* 407 U.S. at 320, 92 S.Ct. at 2138; *cf. United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). To resolve the wiretap's reasonableness under the Fourth Amendment, the Court must examine and balance the varying interests presented here; i. e., "the duty of [the] Government to protect the domestic [and foreign] security, and the potential danger posed by [allegedly] unreasonable surveillance to [plaintiffs'] privacy and free expression." *Keith, supra,* 407 U.S. at 314–15, 92 S.Ct. at 2135.

█ There was justifiably grave concern in early 1969 over the leaking of confidential foreign policy information. The Nixon Administration was seeking new approaches and solutions to a number of persistent world problems, *e. g.,* the Vietnam war, the SALT talks, and Sino-American relations. Unauthorized disclosures could reasonably be viewed as impeding progress and affecting policy-makers' discussions in these areas. It was therefore determined by the highest Executive officials to employ whatever techniques were necessary to investigate and curb leaks. Wiretaps were considered to be one such investigative tool. Specific criteria were established for suspects, including their access to leaked information and their prior security record. A limited number of persons were subjected to such electronic surveillance, many for a relatively short time.

On the other hand, totally apart from objections concerning lack of probable cause in *his* selection, the wiretap on plaintiff

Halperin and his family was maintained for a period of twenty-one months. At no time were there any reviews or evaluation of the material obtained through the electronic surveillance.[6] No attempt was made to minimize the interception of plaintiffs' conversations, either as regards individuals intercepted or information gathered. *Compare Berger v. New York, supra,* 388 U.S. at 58–59, 87 S.Ct. 1873. No further investigation or questioning of Mr. Halperin took place during this period. In addition, the tap continued after he left the National Security Council to engage in various anti-war efforts, and long after many of the other national security wiretaps were removed. Numerous summary letters in the later course of the surveillance relate solely to Halperin's political activities and beliefs.

The wiretap thus appears to have developed into a dragnet which lacked temporal and spatial limitation. It represents the antithesis of the "particular, precise, and discriminate" procedures required by the Supreme Court in numerous Fourth Amendment cases. *See, e. g., Osborn v. United States,* 385 U.S. 323, 329–30, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Berger v. New York, supra,* 388 U.S. at 55–60, 87 S.Ct. 1873; *Katz v. United States, supra,* 389 U.S. at 354–57, 88 S.Ct. 507. The surveillance constituted an invasion of plaintiffs' privacy and freedom of expression. For these reasons, even granting the inapplicability of the general warrant requirement, the Court finds the wiretap *per se* unreasonable under the Fourth Amendment and unjustified by any possible exception thereto.

### III

### A

In identifying which defendants were responsible for the wiretap's long continua-

---

6. *Compare* 18 U.S.C. § 2518(5) (thirty day limit to wiretaps, unless extension granted based upon new showing of probable cause); Memorandum of May 6, 1969 from Attorney General *Mitchell* to FBI Director Hoover, at 5 (renewal requirements for national security electronic interceptions); Deposition of John N. Mitchell at 9–10 (90 day renewal procedures under Justice Department regulations).

The Supreme Court in 1967 strongly condemned the extended duration of interceptions authorized by a New York statute. *Berger v. New York,* 388 U.S. 41, 59–60, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *cf.* S.Rep. No. 1097, 90th Cong., 2d Sess. 101, U.S.Code Cong. & Admin. News 1968, p. 2112 (1968) (Title III duration and renewal provisions tailored to meet constitutional requirements set forth in *Berger* ).

tion, the Court is aided not only by the extensive discovery and documentary evidence in this case but also by wide-ranging Congressional investigations concerning the surveillance program.[7] Despite the fact that recollections differ as to details, the following facts may be stated with certainty:

■ 1.) President Nixon authorized the wiretap program and assumed personal responsibility for its operation.[8]

2.) Attorney General Mitchell signed the authorization form for the Halperin wiretap and occasionally received written summaries of the interceptions. At no time did he formally re-evaluate the fruits of the wiretap or the need for its continuance, as required by Justice Department regulations.[9]

3.) Dr. Kissinger, through Colonel Haig, provided Halperin's name to the FBI. Thereafter, Kissinger and Haig received written reports on the surveillance, but apparently considered oversight and termina-tion responsibilities to lie with the FBI, the President, and the Attorney General. After May 1970, no further reports on the Halperin wiretap were sent to them.[10]

4.) FBI personnel monitoring the Halperin telephone conversations were not informed of the purpose of the surveillance. Nor were guidelines established concerning what to look for or how to minimize intercepted conversations. During the twenty-one month surveillance, no use was made of regular investigative techniques, such as interviews or lie detector tests.[11]

5.) During the period of the wiretap, defendants Haldeman and Nixon were aware of the fact that no information was being obtained relating to leaks and that much nonpertinent information was being gathered. These defendants took no affirmative action to terminate the surveillance or to reduce its scope.[12]

6.) H. R. Haldeman received and disseminated wiretap reports and information during the period between May 1970 and May

---

**7.** *See, e. g.,* Hearings on Dr. Kissinger's Role in Wiretapping Before Senate Comm. on Foreign Relations, 93d Cong., 2d Sess. (1974); Statement of Information, Committee on the Judiciary of the House of Representatives, 93d Cong., 2d Sess., Book VII, pts. 1–4 (1974); H.R.Rep. No. 1305, 93d Cong., 2d Sess. 146–50 (1974) (Judiciary Committee report on impeachment inquiry evidence on wiretap program).

**8.** 9 Pres.Doc. 694 (1973) (statement of May 22, 1973 by President Nixon); Hearings on Dr. Kissinger's Role in Wiretapping, *supra,* note 7, at 111 (letter of President Nixon to Sen. Fulbright); Answer of Defendant Nixon to Second Amended Complaint, filed April 11, 1975.

The Court rejects Mr. Nixon's Motion to Dismiss, filed herein and grounded upon the assertion that his discretionary conduct in office presents a non-justiciable issue or a political question. Numerous recent decisions indicate that government officials are not immune from suit for alleged illegalities committed in office. *See, e. g., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes, supra; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1974). "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 163, 2 L.Ed. 60 (1803).

**9.** Letter of William D. Ruckelshaus to John N. Mitchell May 23, 1973, *Statement of Information, supra,* note 7, book VII, pt. 1, at 177–80; *id.* at 157–76, 187, 192–93; *see also* note 6 *supra.*

**10.** Deposition of Henry A. Kissinger at 36–38, 76–78, 81–86; Deposition of Alexander M. Haig at 92–96, 106–09, 148–49, 151–53, 158–60; Hearings on Dr. Kissinger's Role in Wiretapping, *supra,* note 7, at 173, 185–86, 214–15, 269–74.

**11.** Deposition of Courtland J. Jones at 7, 14, 26; Deposition of Ernest Belter at 38, 43, 57; Deposition of William C. Sullivan at 131; Hearings on Dr. Kissinger's Role in Wiretapping, *supra,* note 7, at 132–38, 153–54, 158.

**12.** Deposition of H. R. Haldeman at 43–44, 56–64; Deposition of Richard M. Nixon at 133–35. In a Feb. 23, 1973 meeting with counsel John Dean, President Nixon noted, "But the taps were [bad], too. They never helped us. Just gobs and gobs of material: gossip and bull . . .. The tapping was a very, very unproductive thing. I've always known that . .. [I]t's never been useful in any operation I've ever conducted." Statement of Information, *supra,* note 7, book VII, pt. 4 at 1754.

1971. Some of the material was apparently used for partisan political purposes.[13]

 From this factual base, the liability and responsibility of certain defendants emerges: former President Nixon, for having initiated and overseen the program without any temporal or informational limits on the surveillance; Attorney General Mitchell, for having failed to carry out review and renewal obligations during the entire twenty-one month surveillance period; H. R. Haldeman, for having reviewed the wiretap material for over a year without recommending termination and for having disseminated the material for purposes unrelated to the tap's original justification.

As to these defendants, no objective good faith defense is available. The Court finds their activities relating to the wiretap continuance unreasonable and in violation of established Fourth Amendment rights. *See Zweibon, supra,* 516 F.2d at 670–73; *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1347–48 (2d Cir. 1972). Nor can these defendants claim absolute immunity for their excessive improper actions. *Compare Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution* (D.C.Cir. 1976).

 As for any contention of subjective good faith, the undisputed record in this case controverts such a defense. In order to show good faith,

> "The official himself must be acting sincerely and with a belief that he is doing right, but an act violating [citizens'] constitutional rights can be no more justified by ignorance or disregard of *settled, indisputable law* . . . than by the presence of actual malice." *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) (emphasis supplied); *see also Zweibon, supra,* 516 F.2d at 671 n. 274.

The evidence here reflects a twenty-one month wiretap continuance without fruits or evidence of wrongdoing, a failure to renew or evaluate the material obtained, a lack of records and procedural compliance, a seemingly political motive for the later surveillance and dissemination of reports, and an apparent effort to conceal the wiretap documents.

 While there may be varying degrees of involvement of these individual defendants, the Court finds under all the circumstances presented that a subjective good faith defense is unavailable. Regardless of intention, they violated plaintiffs' basic, constitutional right to freedom from unreasonable search and seizure. Like any other citizen, these officials are charged with knowledge of established law and must be held accountable for personal misconduct. *See Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. 992. The federal defendants named above are liable in compensatory damages to plaintiffs, such damages to be determined after further briefing by the parties. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.

**B**

Plaintiffs have no objection to the dismissal of the complaint as to Mr. Magruder. Further, there has never been any allegation of personal liability of the current FBI Director, who did not even hold office during the events at issue. The remaining defendants in this lawsuit are entitled to summary judgment.

 As has been noted, Dr. Kissinger and Colonel Haig provided Mr. Halperin's name to the FBI since he appeared to meet the criteria established for those suspected of leaking classified information. Reports were then furnished to them concerning the surveillance, but they regarded the "triumvirate", in Haig's words,—Nixon, Mitchell, and Hoover—as responsible for determining

---

**13.** *See, e. g.,* Summary Letters of May 14, 1970, May 18, 1970, June 11, 1970, June 23, 1970, January 29, 1971.

when to terminate the wiretap. After a period, they received no information on the Halperin matter. In view of their inactive role and the lack of oversight authority vested in Kissinger and Haig, summary judgment as to these defendants is appropriate.

 Although Mr. Sullivan of the FBI played a central role in the Halperin wiretap, his actions appear to have been both reasonable and grounded in good faith. Early in the course of the surveillance, he recognized that little useful or relevant material was being gathered from the surveillance. Accordingly, he recommended discontinuance of the Halperin wiretap. He repeated this recommendation on a number of subsequent occasions. *See* Memorandum of W. C. Sullivan to C. D. DeLoach, June 20, 1969; Letter of William C. Sullivan to Mr. Hoover, July 8, 1969. The fact that his entreaties were rejected does not give plaintiffs a Fourth Amendment cause of action against him.

 The liability of Mr. Mardian is premised upon his after-the-fact efforts in allegedly concealing the wiretap records. Such actions, however reprehensible, do not constitute a fresh violation of plaintiffs' Fourth Amendment rights. Accordingly, the motion for summary judgment as to defendant Mardian will be granted.

 Plaintiffs have sought to keep Mr. Ehrlichman in this action based upon his role as the "conduit" of information for the President and by virtue of a memorandum written in late 1970 or early 1971 concerning use of the wiretap material to anticipate the actions of political opponents. No allegation is made or substantiated that he had any responsibility for the initiation, continuation, or termination of the Halperin wiretap. Nor is mere knowledge of the wiretap program or any after-the-fact activity on his part sufficient to result in liability. Without a cause of action under Title III, any dispute as to Ehrlichman's precise role in "disclosing, using or procuring" intercepted communications, *see* 18 U.S.C. § 2520, becomes moot. For these reasons, defendant Ehrlichman is entitled to summary judgment.

 The final defendant, Chesapeake and Potomac Telephone Company, argues persuasively that it played no part in selecting any wiretap suspects or in determining the length of time the surveillance should remain. It overheard none of plaintiffs' conversations and was not informed of the nature or outcome of the investigation. As in the past, C&P acted in reliance upon a request from the highest Executive officials and with assurances that the wiretap involved national security matters. Under these circumstances, C&P's limited technical role in the surveillance as well as its reasonable expectation of legality cannot give rise to liability for any statutory or constitutional violation.

## IV

In summary, the Court finds that there is no cause of action available to plaintiffs under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 for the wiretapping activities complained of herein; that the wiretapping was unreasonable under the Fourth Amendment; that defendants Nixon, Mitchell and Haldeman share joint liability for the Fourth Amendment violations and cannot avail themselves of any good faith defense; and that summary judgment is appropriate as to the remaining defendants in this action. Further briefing will be necessary on the matter of damages. Within twenty days, counsel for the various parties shall submit proposed orders implementing this opinion.