**Morton H. HALPERIN, et al., Plaintiffs,**

v.

**Henry A. KISSINGER, et al.,
Defendants.**

**Civ. A. No. 1187–73.**

United States District Court,
District of Columbia.

Jan. 13, 1984.

Mark H. Lynch, American Civil Liberties Union, Washington, D.C., for plaintiffs.

Larry L. Gregg, W. Philip Jones, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiffs Morton Halperin, his wife, and their children, originally filed this action for damages against ten government officials alleging that a warrantless wiretap of their home telephone between May, 1969 and February, 1971 violated both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976) (Title III). The case is now before the Court on motions for summary judgment on the issue of immunity filed by defendants Richard Nixon, Henry Kissinger, John Mitchell, and H.R. Haldeman.

The facts of this case and the history of the twenty-one month wiretap are set out in detail in this Court's original decision, *Halperin v. Kissinger*, 424 F.Supp. 838 (D.D.C.1976), and the decision rendered by the Court of Appeals in *Halperin v. Kissinger*, 606 F.2d 1192 (D.C.Cir.1979), *aff'd by an equally divided court*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981). For present purposes, however, certain facts are relevant. In 1969 President Nixon and his top advisors became concerned about disclosures to the press with respect to sensitive foreign policy issues. Thereafter, Nixon authorized a program of electronic surveillance of individuals suspected of leaking classified information. These individuals were to be selected from among those who had access to information which had been leaked, those who had unfavorable information in their security files, and those whom the FBI might indicate as potential sources of leaks after conducting investigations. After allegedly finding that Morton Halperin satisfied all three of these criteria, a wiretap was placed on his home telephone which remained in place for twenty-one months thereafter.

This Court found defendants Nixon, Mitchell, and Haldeman liable under the Fourth Amendment for their roles in the continuation of the surveillance after no "fruit [ ] or evidence of wrongdoing" was produced, *Halperin v. Kissinger, supra,* 424 F.Supp. at 845. The Court rejected, however, plaintiffs' arguments that defendants' actions were in violation of Title III, finding instead that "the indisputable difficulties and ambiguities presented by 2511(3)" precluded its retroactive application. *Id.* at 842. The Court granted summary judgment in favor of Kissinger. *Id.* at 846. The Court of Appeals reversed the grant of summary judgment to Kissinger, finding that genuine issues of fact existed with respect to his role in the installation and maintenance of the wiretap. *Halperin v. Kissinger, supra,* 606 F.2d at 1214. The Court rejected defendants' claims of absolute and qualified immunity as a matter of law and found that Title III would apply "to any period during which the wiretap did not involve the primary purpose of protecting national security information…" *Id.* at 1205. The Court also reversed the award of nominal damages and permitted plaintiffs to alter their theory of damages in this action. *Id.* at 1207–08 & n. 13. The action was remanded for further consideration. *Id.* at 1192.

The Supreme Court granted certiorari but rendered no opinion. By an equally divided court (Justice Rehnquist did not participate), the Court of Appeals' decision was affirmed as to defendants Nixon, Mitchell and Kissinger. *Kissinger v. Halperin,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981). The writ of certiorari was dismissed as improvidently granted as to defendant Haldeman. *Id.* On the same day, the Supreme Court granted writs of certiorari in two cases dealing with immunity for federal officials, *Nixon v. Fitzgerald,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981), and *Harlow (Butterfield) v. Fitzgerald,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981). On June 24, 1982, decisions were rendered in these two cases, *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (hereinafter "Nixon"); *Harlow (Butterfield) v.*

*Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("Harlow").

Defendants now move for summary judgment claiming that they are protected from suit on the grounds of absolute and qualified immunity. The standards applicable to these defenses have been substantially altered and reformulated as a result of the recent *Nixon* and *Harlow* cases and the Court will consider this case in light of these two decisions.

In this proceeding, as in *Nixon,* plaintiffs claim that the former President is liable for both constitutional and statutory violations. Likewise, in both cases the former President has raised absolute immunity as a defense to all claims. In finding that Nixon was entitled to absolute immunity from damage liability predicated on his official acts, the Supreme Court in *Nixon* declared that his "unique status under the Constitution distinguishes him from other executive officials," *Nixon, supra,* 457 U.S. at 750, 102 S.Ct. at 2702, who are normally restricted to a defense of qualified immunity. *Cf. Butz v. Economou,* 438 U.S. 478, 511–512, 98 S.Ct. 2894, 2913–2914, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity extended to prosecutorial officials within the Executive Branch).

■ Based on his special position in our constitutional framework, the President is protected from damages liability for any "acts within the 'outer perimeter' of his official responsibility." *Nixon, supra,* 457 U.S. at 756, 102 S.Ct. at 2705. The President, as chief executive, is entrusted with this country's national security. Plaintiffs concede that investigations of national security disclosures fall within the scope of presidential duties and that Nixon's decision to initiate the surveillance was proper. They contend, however, that the wiretaps were later used by Nixon to collect partisan political information and, at that point, he acted beyond the authority granted to him by the Constitution. This argument is similar to one advanced in *Nixon.* Plaintiff in that case was dismissed from his job. He conceded that a President has the authority to reorganize and reduce the number of employees within the Executive Branch but he alleged that the President's motives (*i.e.,* retaliation for plaintiff's testimony at a congressional hearing) mandated a finding that his actions fell outside his official duties. Judicial inquiries, however, into possible motives for discretionary actions are "highly intrusive," *id.* at 756, 102 S.Ct. at 2705, and disruptive of effective government. If this were permitted, the doctrine of ·absolute immunity, which is based on the separation of powers, would lose its intended effect. *Id. See also Spalding v. Vilas,* 161 U.S. 483, 499, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896); *Briggs v. Goodwin,* 569 F.2d 10, 15 (D.C.Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). It is enough that "the occasion was such as would have justified the act, if he had been using his power for any of the purposes ... it was vested in him." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). This Court finds that Richard Nixon had the power to investigate national security ·leaks and that his actions were within the "outer perimeter" of his constitutional duties. He is, therefore, protected from any damage liability by the doctrine of absolute immunity.[1]

■ Governmental officials may also avail themselves of qualified immunity "to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow, supra,* 457 U.S. at 806, 102 S.Ct. at 2732. The doctrine

---

1. The Court rejects plaintiffs' argument that, in providing for a civil remedy against "any person," 18 U.S.C. § 2520, who violates the terms of Title III, Congress expressed a clear intent to abrogate the well-established tradition of absolute immunity. The President is absolutely immune from damages liability for his official acts in the absence of explicit affirmative action by Congress. *Nixon, supra,* 457 U.S. at 756, 102 S.Ct. at 2705. Clear congressional intent may not be implied from the general language cited by plaintiffs. *See Briscoe v. Lahue,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951).

of qualified immunity now focuses on whether a government official's conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2739, *citing Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978) *and Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). A noteworthy aspect of the new qualified immunity test is the irrelevance of defendants' subjective intent. Before *Harlow,* courts frequently considered whether an official acted with "malicious intention to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland, supra,* 420 U.S. at 320, 95 S.Ct. at 1000. *See, e.g., Procunier v. Navarette, supra,* 434 U.S. at 562, 98 S.Ct. at 860.

The task of this Court is to measure defendants' conduct in light of the clearly established law as it existed between May, 1969 and February, 1971. In considering the legality of the electronic surveillance of the Jewish Defense League in 1970 and 1971, the Court of Appeals recently held that as late as July 3, 1971, there were no clearly established warrant requirements and "that for purposes of qualified immunity Mitchell had entertained a reasonable belief in the legality of his conduct." *Zweibon v. Mitchell,* 720 F.2d 162 at 169 (D.C. Cir.1983) (hereinafter *"Zweibon IV"*) *citing Sinclair v. Kleindienst,* 645 F.2d 1080, 1084–85 (D.C.Cir.1981). Likewise, defendants' liability in this case cannot be based on the absence of a warrant.

▮ The *Zweibon IV* court also considered the applicable reasonableness requirement for warrantless electronic surveillances during 1970 and 1971 and found that there "was no judicially imposed reasonableness requirement for national security wiretaps at the time (1970–1971)." *Id.* at 169, *quoting Sinclair v. Kleindeinst, supra,* 645 F.2d at 1082. As late as 1972 the Supreme Court had "declined to delineate 'precise standards for domestic security warrants.'" *Id.* at 169, *quoting United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *see also Chagnon v. Bell,* 642 F.2d 1248 (D.C.Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). Due to the absence of any clearly established warrant or reasonableness requirements at the time, defendants Kissinger, Mitchell and Haldeman are protected from liability for their roles in this electronic surveillance program.

Plaintiffs attempt to distinguish this wiretap from the ones found exempt from the warrant and reasonableness requirements in *Sinclair* and *Zweibon IV.* They contend that the primary purpose for this surveillance was not national security and thus was subject to the substantive and procedural terms of Title III. The Court disagrees. Halperin, by his own admission, was exposed to sensitive national security information while on the NSC staff. After the summer of 1969, when Halperin left the NSC staff, he remained a potential national security risk because much of the information made available to him retained its classified status. Defendants need not prove that Halperin leaked specific information which actually compromised the national security in order to successfully avail themselves of the warrant exemption contained in Title III. *See Ellsberg v. Mitchell,* No. 72–1879 (D.D.C. July 22, 1983) (following *Harlow* and *Sinclair,* the Court refused to inquire into the motives behind a warrantless electronic surveillance of the Los Angeles Chapter of the Black Panther Party in 1969. Defendant was granted summary judgment based on qualified immunity.) The objective record in this case reflects a rational national security concern.

In view of the foregoing, the Court finds that former President Nixon is entitled to summary judgment as a matter of law on the basis of absolute immunity and that Kissinger, Mitchell, and Haldeman are entitled to summary judgment based on qualified immunity.