**Richard L. WINDSOR,
Plaintiff-Appellant,**

v.

**THE TENNESSEAN, et al.,
Defendants-Appellees.**

No. 81–5668.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 12, 1982.

Decided Oct. 12, 1983.

Rehearing Denied Jan. 23, 1984.

Robert L. Huskey, Manchester, Tenn., for plaintiff-appellant.

Joe B. Brown, U.S. Atty., Aaron Wyckoff, Nashville, Tenn., Barbara L. Herwig, R. Joseph Sher (argued), Civ. Div., Torts Branch, Washington, D.C., Alfred H. Knight, III (argued), Marian F. Harrison, Nashville, Tenn., for defendants-appellees.

Before EDWARDS and CONTIE, Circuit Judges, and MOYNAHAN, Chief District Judge.[*]

CONTIE, Circuit Judge.

Plaintiff Windsor, a former assistant United States attorney, appeals a district court order dismissing his complaint for failure to state a claim upon which relief can be granted. *Fed.R.Civ.P.* 12(b)(6). Appellees are *The Tennessean,* a newspaper; John Seigenthaler, its publisher; Wayne Whitt and Carol Clurman, two of the newspaper's employees; and Hal Hardin, former United States attorney for the Middle District of Tennessee. The complaint raises claims for damages under the fifth amendment's due process clause, under 42 U.S.C. § 1985(1), under 5 U.S.C. § 552a and under state law for defamation, malicious interference with employment and "outrageous conduct." The district court dismissed the federal constitutional and statutory claims. It remanded the state claims, with one exception, to the state court from which the action had been removed. Windsor does not appeal the remand. The state claims against Hardin were dismissed on the

---

* The Honorable Bernard T. Moynahan, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky sitting by designation.

ground of absolute immunity rather than remanded.

When evaluating a motion to dismiss brought pursuant to rule 12(b)(6), the factual allegations in the complaint must be regarded as true. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–349, 15 L.Ed.2d 247 (1965). The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Windsor's complaint alleges that the defendants conspired either to remove him from his position as assistant United States attorney (AUSA) or to force him to resign.

After Hardin was appointed United States attorney in 1977, Windsor, who had been appointed in 1974, accused Hardin of favoritism toward certain defendants, attorneys and political parties. Tension between the two increased because of separate incidents involving John Seigenthaler, publisher of *The Tennessean* and a prominent political figure. In early 1979, Windsor mentioned certain matters about Seigenthaler to a local government attorney. When Seigenthaler learned of this discussion, he called Hardin in anger and claimed that Windsor had disparaged him. In January, 1980, a grand jury witness told Seigenthaler that Windsor had presented evidence to the grand jury linking Seigenthaler to a bingo operation. The latter again became highly upset and complained vociferously to Hardin. Hardin then stormed into Windsor's office and demanded an explanation about why Seigenthaler's name had been mentioned before the grand jury. Plaintiff claims that after this time, Hardin feared Seigenthaler and tried to appease him.

In June, 1980, Windsor was called to testify at a suppression hearing in an insurance fraud case. During this proceeding, the trial Judge expressed concern about prosecutorial misconduct on Windsor's part. Allegedly seizing on the opportunity for revenge against the plaintiff, Seigenthaler caused *The Tennessean* to make "daily fanfare" of these charges while ignoring plaintiff's thorough and satisfactory explanations. In addition, Windsor contends that the newspaper knowingly and/or recklessly made blatantly false statements about him for the dual purposes of injuring his reputation and pressuring Hardin to discharge him.

Hardin, "partially as a result of the pressure put upon him by [Seigenthaler] and partially due to his own friction with [the] Plaintiff joined with and conspired with the other Defendants" (App. at 19) to force Windsor from his job. In furtherance of this conspiracy, Hardin had the insurance fraud case dismissed and the newspaper continued to print defamatory material about plaintiff. In July, 1980, Hardin attended a United States attorneys conference in Oregon. At this meeting, and in furtherance of the conspiracy, Hardin presented to the Deputy Attorney General of the United States and another high official[1] the false and defamatory news articles. He suggested that Windsor be terminated. Hardin also prepared a letter addressed to the plaintiff which stated four reasons for the discharge.[2]

Windsor was next ordered to go to Washington, D.C. in order to meet with Deputy Attorney General Renfrew. Renfrew purportedly told Windsor that the latter was not entitled to due process and that all factual determinations had been made. Plaintiff was given the option of resigning within ten days or being fired and having the damaging letter placed in his personnel

1. Neither the Deputy Attorney General nor the other official are parties in this case.

2. The reasons were: 1) drafting a legally insufficient search warrant, 2) issuing grand jury subpoenas for previously suppressed evidence in defiance of a court order, 3) subpoenaing himself to the grand jury and then presenting suppressed evidence and 4) drafting a discourteous memorandum to the court. Windsor contests the validity of all of these grounds for termination which allegedly were based on articles in *The Tennessean*.

file. Several days later, Windsor resigned and the letter was discarded. Windsor sued in state court and the action was removed on December 31, 1980.

I.

Windsor initially contends that he was entitled to procedural due process under the fifth amendment before being terminated. The district court found, however, that since plaintiff possessed no legitimate property or liberty entitlement, due process was not necessary. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 35 L.Ed.2d 548 (1972). We agree with the district court.

Windsor possesses no property entitlement because the Attorney General's power to remove assistant United States attorneys is unconditional. 28 U.S.C. § 542(b). This prerogative has in turn been delegated to the Deputy Attorney General, 28 CFR § 0.15(b)(3)(i), who exercised that authority in this case. When a supervisor possesses unconditional power to discharge a subordinate, that employee obviously has no entitlement to his job.

Nor does plaintiff possess a liberty interest. Such an interest could arise if false reasons for the discharge were publicly disseminated, thus stigmatizing Windsor and foreclosing other employment opportunities.

*See, e.g., Roth,* 408 U.S. at 572–73, 92 S.Ct. at 2706–2707. Windsor does not allege, however, that the reasons for the discharge were publicly disclosed. Consequently, even if the reasons were untrue or fabricated, Windsor has not pleaded a protectible liberty interest in his professional reputation. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Since Windsor has no protectible property or liberty interest in continued employment, this court need not discuss what process would be due were plaintiff to possess such an interest.

II.

In his amended complaint, Windsor seeks damages for an alleged violation of 5 U.S.C. § 552a.[3] This statute provides rules concerning what information a federal agency may keep about employees, the circumstances and procedures under which that information may be released and the safeguards required in order to insure that all information is accurate. Windsor alleges that Hal Hardin improperly released inaccurate information from Windsor's personnel file in violation of section 522a(e)(5) and (10).[4] Nevertheless, the district court correctly held that plaintiff has stated no claim upon which relief can be granted under that language.

**3.** On appeal, plaintiff also claims that he is entitled to damages because the government did not follow the procedures required by 5 U.S.C. § 4303, a section of the Performance Rating Act. Since Windsor did not present this claim in his complaint and since the district court did not decide the question, we decline to consider the issue. Were we to decide, however, we would hold that section 4303 does not apply in this case. That statute deals with personnel actions based upon unacceptable performance ratings. The procedural safeguards mandated by that provision apply to removals and reductions in grade affected under that section. Windsor's termination was affected not under that section but under the Attorney General's unconditional power to discharge assistant United States attorneys. 28 U.S.C. § 542(b). Plaintiff therefore has no claim under 5 U.S.C. § 4303. *Cf. Schaefer v. United States,* 633 F.2d 945, 224 Ct.Cl. 541 (1980) (since the Veterans Preference Act and the Performance Rating Act provide separate means of terminating an employee, a discharge under the Veterans Preference Act need not comply with the provisions of the Performance Rating Act).

**4.** These provisions read:
*Agency Requirements.* Each agency that maintains a system of records shall—
5. Maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

. . . . .

10. Establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial embarrassment, inconvenience, or unfairness to any individual on whom *information is maintained* . . . .

Section 552a sets forth remedies for violations of its provisions. A civil damage action may be brought solely against an "agency." 5 U.S.C. § 552a(g). The term "agency" does not encompass individual government officials such as Hardin. *Bruce v. United States,* 621 F.2d 914, 916 n. 2 (8th Cir.1980); *Parks v. United States Internal Revenue Service,* 618 F.2d 677, 684 (10th Cir.1980). Since Windsor has not sued the agency for which he worked and since Congress could have exposed individuals to civil liability under section 552a(g) but chose not to do so,[5] plaintiff has not stated a claim under section 552a even if the defendants violated that section in this case.[6]

Windsor claims in the alternative, however, that by conspiring to violate section 552a(e)(5) and (10), the defendants infringed upon his constitutional right to privacy. This argument is without merit. While Windsor relies on a congressional finding in the Privacy Act of 1974 that the right to privacy is a personal and fundamental constitutional right, the district court correctly held that this finding does not transform every section 552a violation into a constitutional tort. The Supreme Court in *Paul v. Davis,* 424 U.S. 693, 712–13, 96 S.Ct. 1155, 1165–1166, 47 L.Ed.2d 405 (1976), held that its right to privacy cases prohibited certain restrictions on personal freedom in "matters relating to marriage, procreation, contraception, family relationships and child rearing and education." As was the plaintiff's claim in *Paul v. Davis,* Windsor's action is "far afield from this line of decisions" because the claim involves not a substantive restriction on Windsor's freedom in the areas delineated but rather a procedural constraint on the government's authority to collect, hold and distribute information about its employees. *See id.* at 713, 96 S.Ct.

at 1166. Even if defendants transgressed section 552a, that violation would not implicate Windsor's constitutional right to privacy.

### III.

Windsor also claims that the defendants violated 42 U.S.C. § 1985(1) by conspiring to injure the appellant "in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof. . . ." The injury claimed is that defendants conspired to print and did print defamatory newspaper articles about Windsor, knowing the information to be false or with reckless disregard of its truth or falsity. These articles were then used to convince Justice Department officials in Washington, D.C., to terminate appellant. It should be noted that § 1985(1) provides only for damages. Accordingly, plaintiff may not seek reinstatement under that section and thereby circumvent 28 U.S.C. § 542.

Defendants initially contend that the complaint inadequately alleges conspiracy. While this point was raised before the district court, that court did not discuss it. Both the federal and private appellees argue that the complaint alleges not an agreement between Hardin, Seigenthaler and the other parties, but only a cause and effect relationship wherein Hardin acted independently in response to pressure from the private appellees. The complaint clearly alleges, however, that Hardin conspired and joined with the private defendants in order to drive Windsor from office (App. at 19). That Hardin's partial motive for joining the conspiracy may have been his fear of Seigenthaler cannot obscure the fact that he is alleged to have agreed. Furthermore,

---

**5.** If Congress had wanted to subject officials to individual liability, it knew how to do so. For instance, federal officials are subject to the criminal provisions of 5 U.S.C. § 552a(i).

**6.** We believe that no such infraction occurred. The gravamen of the complaint is that the defendants conspired to present the defamatory newspaper articles to the Deputy Attorney General in order to secure Windsor's discharge. These articles surely were taken, however, not

from Windsor's personnel file, but from the public domain. Since defendants did not transgress section 552a, they would not be liable even if that section provided for individual liability in damages. Moreover, since no violation occurred, this allegation is irrelevant to the questions of section 1985(1) liability or of Hardin's possible immunity, although Windsor contends to the contrary.

Windsor claims that Hardin's personal dislike for appellant contributed to the decision to join.

■ The private defendants also contend that appellant's conspiracy allegations are conclusory and are therefore inadequate. *See Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir.1971). Although the complaint does not state the exact time and place of the agreement, it does allege that Hardin and the other defendants were in contact with each other throughout the time period in question regarding the Windsor problem. Under the facts of this case, we hold that appellant has adequately pleaded conspiracy.

The district court held that the complaint does not state a claim upon which relief can be granted because section 1985(1) was intended by the 42nd Congress to deal only with violent or physical interference with a federal officer's ability to perform his job. *See Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1334–36 (7th Cir.1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). Consequently, the court held that injuries to reputation are not actionable under section 1985(1).

■ The Seventh Circuit in *Stern* no doubt stated that the problem upon which the 42nd Congress focused did not include unjustified attacks on a federal official's reputation:

> It would, in fact, surprise us if any member of that Congress ever specifically contemplated the application of the provisions which became section 1985(1) to a conspiracy to defame and discredit a revenue officer to his superiors. [*Id.* at 1335.]

The *Stern* court nevertheless refused to hold that a conspiracy to defame an Internal Revenue Service officer, which resulted in an adverse employment action being taken against that officer, was not cognizable under section 1985(1) for that reason. Although post-civil war violence in the South induced Congress to act, it responded by passing a statute "cast in general language of broad applicability ... and unlimited duration." *Id.* Moreover, construing section 1985(1) to encompass the claim raised in Windsor's complaint is consistent with the Supreme Court's approach toward the Reconstruction civil rights statutes. In *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971), for example, the court stated that those statutes should be accorded "a sweep as broad as their language." Defamation has long been regarded in American jurisprudence as an injury to the person. Hence we hold that a conspiracy to harm a federal official's reputation on account of his lawful discharge of his duties, or while engaged in the lawful discharge thereof, is actionable under 42 U.S.C. § 1985(1).[7]

In its opinion, the district court further expressed concern that exposing Seigenthaler to liability for telephoning Hardin in order to complain about Windsor would infringe upon Seigenthaler's first amendment right to petition for redress of grievances. The court again referred to *Stern,* which held that although it was otherwise possible to state a claim for conspiracy to defame a federal official under section 1985(1), no cause of action was stated in that case because the threats of suit and of potential liability imposed too great a burden upon the first amendment rights of the private persons who complained about IRS agent Stern. *Id.* at 1344.

■ We agree with the district court's conclusion but not its reasoning. Windsor admits (appellant's brief at 31) that since the two telephone conversations occurred

---

7. The district court also held that the complaint does not state a cause of action because transgressions of section 1985(1) would also constitute violations of 18 U.S.C. § 372, a criminal provision and counterpart to section 1985(1) having nearly identical language. The court felt that holding persons and media organizations criminally liable for defamation would raise grave constitutional questions. Since no defendant in this case has been criminally prosecuted, however, the problem of construing 18 U.S.C. § 372 is not before us. We will await the appropriate case before dealing with that issue.

months before the alleged conspiracy, the conversations cannot be considered part of the scheme to defame the defendant and thereby to procure his discharge. Thus Seigenthaler cannot be liable under section 1985(1) for making the two telephone calls. We disagree, however, with the notion that a private person who conspires deliberately to defame a federal official in order to discredit that official in the eyes of his superiors is protected by the first amendment right to petition for redress of grievances.

In *White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845), the defendants wrote defamatory letters to the President of the United States in order to procure the discharge of the plaintiff, a federal customs officer. Upon being fired, White sued for libel, alleging that the defendants had transmitted what they knew to be false information. Defendants contended that their actions were absolutely protected by their rights to petition for redress of grievances and to comment upon the fitness of public officials. The court rejected their argument. Though one who unintentionally defamed an official when presenting a complaint would be protected, a person who deliberately did so would not. The court reversed and remanded the case for trial.[8]

Although *White v. Nicholls* obviously was not a section 1985(1) action, it is nonetheless analogous to the present case. In both cases, the complaint charged the defendants with deliberately attempting to procure the discharge of a federal official through defamation. Section 1985(1) additionally requires that a conspiracy be present. We therefore hold that the first amendment right to petition for redress of grievances does not protect from section 1985(1) liability those who conspire intentionally to defame a federal officer in order to effect that official's discharge. To the extent that *Stern* holds to the contrary, we decline to follow it.

■ For the same reason that the district court ruled that Seigenthaler could not be held liable for the two telephone calls, it held that *The Tennessean* and its employees could not be sued under section 1985(1) for their part in the alleged conspiracy. In light of the foregoing discussion of *White v. Nicholls,* this decision was error. The private appellees are of course entitled to the protections required by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). They therefore may not be held liable for conspiring to print and use defamatory newspaper articles unless they knew the information contained in the articles was false or unless they printed the information with reckless disregard of whether it was true or false. Though the *New York Times* case dealt with state tort law, the rule annunciated is a constitutional test. We see no reason not to apply that test to section 1985(1) actions.

## IV.

■ Although the plaintiff has stated a cause of action under § 1985(1), we hold that each appellee has a valid defense. We first consider the private defendants. Subsequent to the oral argument in this case, the Tennessee Court of Appeals held that the newspaper articles which form the basis of Windsor's federal action were not defamatory under the *New York Times* test. *Windsor v. The Tennessean,* (Tenn.App., filed April 26, 1983). As to the private defendants, therefore, the plaintiff is collaterally estopped in the present litigation to prove that the articles are defamatory. *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 597–98, 68 S.Ct. 715, 719–720, 92 L.Ed. 898 (1948). Accordingly, the plaintiff's § 1985(1) claim against these defendants must fall; even if Hardin and the media defendants agreed to print and use the newspaper articles at issue in order to procure Windsor's discharge, they agreed to engage in constitutionally protected

---

**8.** *White v. Nicholls* has not been overruled. The Supreme Court cited the case fairly recent-

ly. *See Herbert v. Lando,* 441 U.S. 153, 163 n.

speech. Such activity cannot form the basis of a § 1985(1) action.[9]

Whether Hardin is entitled to assert collateral estoppel is a question we need not reach because the § 1985(1) claim against him can be disposed of without reaching the merits. The district court held that Hardin is absolutely immune from liability in light of the plurality opinion in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Plaintiffs in that case brought a common law libel action against a federal official over the contents of an unfavorable press release issued by that official. The Court held that because this discretionary conduct lay "within the outer perimeter of petitioner's line of duty," *id.* at 575, 79 S.Ct. at 1341, he was entitled to absolute immunity despite allegations of malice in the complaint. The district court applied *Barr* to the present case and held that since forwarding complaints about Windsor's conduct to the Deputy Attorney General was well within the scope of Hardin's duties, the latter was entitled to absolute immunity from liability under both state law and section 1985(1).

Insofar as it relied upon *Barr* in dismissing the state law claims against Hardin, the district court ruled correctly. *See Granger v. Marek,* 583 F.2d 781 (6th Cir.1978). The district court erred, however, in dismissing the § 1985(1) claim on the basis of absolute immunity. In reaching its decision, the district court distinguished *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Supreme Court held in *Butz* that although a federal official remained absolutely immune from liability under state tort law for discretionary actions done within the scope of his authority, such an official merited only qualified immunity for actions taken in violation of the federal constitution. The district court in the

present case reasoned that since Windsor has alleged a federal statutory violation rather than a federal constitutional violation, *Butz,* is inapposite and *Barr* controls. We disagree.

Although *Butz* involved solely a constitutional violation, the court commented:

It is apparent also that a quite different question would have been presented had the officer [in *Barr* ] ignored an express *statutory* or constitutional limitation on his authority. [*Id.* at 489, 98 S.Ct. at 2902 (emphasis supplied).]

Thus the court in *Butz* left open the possibility that federal officials would not be absolutely immune from liability for violating citizens' federal statutory rights. The court held that absolute immunity generally would not be available in such cases in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Harlow involved a suit against Presidential aides Bryce Harlow and Alexander Butterfield for conspiring to have Fitzgerald discharged from his job with the Air Force. Plaintiff alleged that defendants were civilly liable for violating the first amendment and both 5 U.S.C. § 7211 and 18 U.S.C. § 1505. Although the court mentioned that *Barr* had granted federal officials absolute immunity from suits at common law, *id.* at 2733, the court held that federal officials who violate statutory or constitutional rights usually merit only qualified immunity. We therefore hold that *Barr* does not control the present case and that Hardin's absolute immunity claim must be evaluated in light of the more recent Supreme Court decisions.[10]

■■■ The general rule is that executive branch officials are entitled only to qualified immunity save in "those excep-

10, 99 S.Ct. 1635, 1642 n. 10, 60 L.Ed.2d 115 (1979).

**9.** One might claim that the defendants could have conspired to defame the plaintiff in violation of § 1985(1) even though these particular newspaper articles were not defamatory. Since the only overt acts pleaded by Windsor were the publication and use of these articles, this potential argument must be rejected.

**10.** In fairness to the district court, *Harlow* and its companion case, *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), were decided after the decision in the present case. This court has held that *Harlow* applies retroactively. *Wolfel v. Sanborn,* 691 F.2d 270, 272 (6th Cir.1982).

tional situations where it is demonstrated that absolute immunity is essential for the conduct of public business." *Butz,* 438 U.S. at 507, 98 S.Ct. at 2911. Federal officials seeking absolute immunity "bear the burden of showing that public policy requires an exemption of that scope." *Id.* at 506, 98 S.Ct. at 2911; *see also Harlow,* 102 S.Ct. at 2733, 2735–36. Although the Supreme Court has held that the function of advocating for the conviction of criminal defendants is of such a nature that prosecutors enjoy absolute immunity in discharging that responsibility, *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976),[11] the courts of appeals have generally held that prosecutors acting in their investigative or administrative capacities merit only qualified immunity. *See Dellums v. Powell,* 660 F.2d 802 (D.C.Cir.1981); *Mancini v. Lester,* 630 F.2d 990 (3d Cir. 1980); *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Lee v. Willins,* 617 F.2d 320 (2d Cir.1980), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981); *Jacobson v. Rose,* 592 F.2d 515 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979). While the Supreme Court did not accept or reject the validity of this distinction in *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 994–995, it appeared willing to endorse the distinction in *Harlow.* 102 S.Ct. at 2735 n. 16. Since the duty of recommending the hiring or firing of assistant United States attorneys is a classic example of an administrative function, Hardin is not entitled to absolute immunity in this case.

This conclusion is buttressed by directly applying the criteria which the Supreme Court has found to be relevant in adjudicating immunity questions. A decision on immunity must be:

> Predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it. [*Imbler,* 424 U.S. at 421, 96 S.Ct. at 748.]

In addition, this court must consider public policy arguments. *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 2701, 73 L.Ed.2d 349 (1982).[12]

As has been indicated, prosecuting attorneys have traditionally been accorded absolute immunity only when performing their quasi-judicial functions. One justification for this protection is that prosecutors must be insulated from the threat of retaliatory lawsuits by disgruntled defendants. To permit such suits would deter government prosecutors from vigorously enforcing the law and would require those attorneys to spend inordinate amounts of time defending against civil liability. *See Butz,* 438 U.S. at 508–10, 98 S.Ct. at 2911–2912; *Imbler,* 424 U.S. at 424–25, 96 S.Ct. at 992.

Even though Hardin was performing only an administrative function in this case, he contends that he deserved protection from retaliatory lawsuits foreseeably stemming from the discharge of his duty to make personnel recommendations, favorable or unfavorable, to the Deputy Attorney General. In support of this claim, Hardin cites *Lawrence v. Acree,* 665 F.2d 1319 (D.C.Cir. 1981), a section 1985(1) case in which a former regional commissioner of the United States Customs Service sued his superiors for conspiring to force him to resign. The complaint alleged that the defendants had filed an unwarranted adverse performance evaluation about the plaintiff. The court held the defendants absolutely immune because:

> The strong governmental interest in having a frank and honest assessment of

---

**11.** Although *Imbler* involved a state prosecutor rather than a United States Attorney, this distinction is irrelevant. *See Harlow,* 102 S.Ct. at 2338–39 n. 30; *Butz,* 438 U.S. at 504, 98 S.Ct. at 2909.

**12.** The court in *Nixon* also held that constitutional and statutory provisions can be relevant to immunity questions. The parties have not cited, and this court has not found, any constitutional or statutory provision which would control this case.

federal employee work performance is absolutely essential to the proper rendering of federal services to our citizens. A supervisor's candid evaluation promotes efficient government by enabling an agency to identify and reward truly outstanding performance and to identify and correct, and on occasion dispense with, performance that is unsatisfactory. The judgment might be distorted if their immunity from damages arising from that decision was less than complete. [*Id.* at 1327.]

While this argument is not without force, it has been blunted by the *Harlow* decision. Of critical importance is that *Harlow* involved an alleged conspiracy to drive a plaintiff from federal employment. Yet the court accorded the defendants only qualified immunity. If Presidential advisors are only entitled to qualified immunity for their participation in personnel decisions, then United States Attorneys should be treated similarly.

Secondly, the burden of retaliatory lawsuits filed by former employees is reduced by the operation of the new qualified immunity standard promulgated in *Harlow*. The test is:

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [*Id.* 102 S.Ct. at 2738.]

The trial judge is to apply this purely objective test as a matter of law before discovery occurs. If the law which the defendant is alleged to have violated is clearly established, then the qualified immunity defense should fail and discovery should proceed. If the law is not clearly established, the defendant is immune. The court held that this procedure will adequately protect government officials from insubstantial claims which in the future can be resolved by summary judgment. *Id.* at 2739. The barriers to summary judgment presented by

the discarded mixed objective-subjective test, *id.* at 2737–38, no longer exist.

Another factor weighing in favor of qualified immunity is that Windsor has no remedy for the alleged injury caused by Hardin other than a section 1985(1) action; for we have already held that Windsor's constitutional, Privacy Act and state law claims against Hardin were properly dismissed. The presence or absence of alternative remedies has played an important role in the Supreme Court's decisions regarding official immunity. *Nixon,* 102 S.Ct. at 2706 n. 38. Furthermore, *Lawrence v. Acree* is distinguishable on this ground because the court in that case specifically found that plaintiff had an alternative remedy under the Performance Rating Act. 665 F.2d at 1327. Accordingly, we hold that former United States Attorney Hardin may only assert qualified immunity as set forth in *Harlow.*

Since Hardin's entitlement to immunity is a question of law, we will address the matter rather than require the district court to decide the point on remand. This court is unaware of any case in which a federal official has successfully been sued under section 1985(1) for conspiring to defame a subordinate and to effect the latter's discharge. Although the Seventh Circuit held in *Stern* that injuries to reputation are cognizable under section 1985(1), that case was dismissed upon first amendment grounds which we have declined to follow. Nor were the defendants in that litigation employed in government service.

■■■ Consequently, we hold that a reasonable person would not have known in 1980 that an agreement to defame a federal official in order to effect that person's discharge from federal employment violated section 1985(1). Since Hardin did not transgress a clearly established federal statutory right, *Harlow* requires immunity for Hardin in the present case. Similar violations by federal officials or employees will, however, be actionable in the future.

## V.

The district court properly dismissed Windsor's claims against all defendants

166

which were based upon the federal constitution and 5 U.S.C. § 552a. It also correctly dismissed the state law claims against Hardin. Although the plaintiff has stated a claim under 42 U.S.C. § 1985(1), each appellee possesses a complete defense. Accordingly, the judgment of the district court is AFFIRMED.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge, concurring.

I concur in Judge Contie's opinion for the court. I write separately only to note that I would accept the First Amendment reasoning of the majority in *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1342–43 (7th Cir.1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), as alternative ground for support of the conclusion set forth in Section V. of Judge Contie's opinion.

MOYNAHAN, Chief District Judge, concurring in part and dissenting in part.

I concur in the result reached in Judge Contie's opinion, but dissent from that portion thereof which holds that the defendant, Hardin, was not entitled to claim absolute immunity in connection with the § 1985(1) claim.

I am convinced that subjecting the United States Attorney to potential liability for relaying complaints regarding the actions of his Assistant to a Deputy Attorney General is a dangerous precedent and represents a serious erosion of the powers and responsibilities of the United States Attorney.

I am further convinced that such disposition of this case may well provoke extensive litigation and necessitate diversion of the Prosecutor's efforts from the duties of his office to defending himself against baseless suits by disgruntled employees.

I find nothing in the cases cited in the majority opinion, including *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) which militates against this conclusion.

As this expressly prospective ruling promulgated by the majority opinion is of critical importance to the Officers of the Criminal Justice System, I question whether it should be disposed of by a panel rather than by the full Court.