765 F.2d 590
 54 USLW 2031
 Dr. John Joseph MANION, Plaintiff-Appellee,
v.
MICHIGAN BOARD OF MEDICINE (formerly Medical Practice
Board); Donald H. Kuiper, M.D.; James C. Brenaman, M.D.;
James L. Fenton, M.D.; John F. Fennessey, M.D.; Henry A.
Kallet, M.D.; Carol E. Pearson, M.D.; F. Ann Pillote,
M.D.; Addison E. Prince, M.D.; Margaret J. Thoms; James
B. Dresbach; Karen D. Kotch, P.A.; Norman J. Rotter, M.D.;
Edward R. Weddon, M.D.; Sondra C. Shaw; Bert C. Brennan;
Leslie N. Greenwald; and James C. Burdick, Defendants-Appellants.
 No. 84-1053.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 12, 1984.
Decided June 24, 1985.
 
 1
 Frank J. Kelley, Atty. Gen. of Michigan, and Max R. Hoffman, Jr., argued, Lansing, Mich., for defendants-appellants.
 
 
 2
 Jeffrey L. Hampel, argued, Wyoming, Mich., for plaintiff-appellee.
 
 
 3
 Before LIVELY, Chief Judge, MERRITT, Circuit Judge, and HORTON, District Judge.*
 
 
 4
 HORTON, District Judge.
 
 
 5
 The issue certified to this Court by the United States District Court for the Western District of Michigan is whether members of the Michigan Board of Medicine, sued in their individual capacities under 42 U.S.C. Sec. 1983, are entitled to claim the defense of immunity, either absolute or qualified, in the discharge of their statutory duties pertaining to the licensure of persons to practice medicine in the state of Michigan.
 
 
 6
 We answer the question as follows: Members of the Board of Medicine are not entitled to claim the defense of absolute immunity. We find their duties do not rise to that level of governmental responsibility justifying the protection of absolute immunity. However, we hold Board members are entitled to claim the defense of qualified immunity. We find qualified immunity to be appropriate because Board members do perform discretionary acts in the performance of their statutory duties and qualified immunity is adequate to their protection. The entitlement to claim a defense of qualified immunity, however, depends upon an appraisal of the objective legal reasonableness of an official's conduct, as measured by reference to clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982).
 
 
 7
 We think the District Court recognized Board members' right to claim the defense of qualified immunity. We think the Court's ruling denying the Board's motion for summary judgment on this issue was correct, based upon the facts then before the Court.
 
 
 8
 This lawsuit was filed by Dr. John Joseph Manion, a physician, pursuant to 42 U.S.C. Sec. 1983, in the United States District Court for the Western District of Michigan against the State of Michigan, its Board of Medicine (Board), individual members of the Board and Bert C. Brennan, then acting Executive Director of the Board. Dr. Manion claimed his constitutional rights were violated by: (1) the Board's failure to inform him he was licensed to practice medicine in Michigan in 1977; (2) the Board's failure to investigate allegations that he was not fit for licensure to practice medicine from 1977 to 1981; (3) termination of his license in 1978; (4) failure in 1978, to give him proper notice of the requirement to renew his license and the manner in which to renew it; and (5) failure to license him to practice medicine in Michigan from 1978 to the present time. The Board, seeking dismissal of all Dr. Manion's claims, asserted numerous reasons, one of which was the defense of immunity.
 
 
 9
 The District Court, citing Wilkerson v. Johnson, 699 F.2d 325 (6th Cir.1983), ruled members of the Board were not entitled to the protection of absolute immunity. Additionally, the District Court ruled Board members had failed to show sufficient facts to support a finding of good faith qualified immunity. Therefore, the District Court denied dismissal of the lawsuit upon either the doctrine of absolute immunity or that of qualified immunity. However, the District Court concluded that "the question of defendant's claim of immunity presents a question of law for which there is substantial ground for difference of opinion, and is also a controlling question of law, the resolution of which will materially advance the ultimate termination of this litigation," and consequently found that "the question is properly certifiable for appeal."
 
 
 10
 Board members present two approaches to their claim of immunity. First, they claim they are entitled to absolute immunity. In the alternative, Board members claim they are entitled to qualified immunity.
 
 
 11
 Board members claim they are entitled to absolute immunity because in the course of their licensing duties, under Michigan law, they perform (1) an investigative function and (2) an adjudicative function. Board members claim they are required by statute to authorize investigations to determine qualifications of applicants for medical licensure and to determine whether, after hearing, when necessary, applicants are qualified to practice medicine in Michigan.
 
 The Doctrine of Immunity
 
 12
 The doctrine of immunity grew out of a determination that officials of government should be free to exercise their duties unencumbered by fear of a lawsuit with respect to acts done in the course of their duties. Barr v. Mateo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed 1019 (1951). On the whole, immunity has been thought to encourage fearless public service more than it invites brazen excess. Barr, supra, 360 U.S. at 571, 79 S.Ct. at 1339. See also, Laurence Tribe, American Constitutional Law Sec. 4-13 (Foundation Press New York 1978). Yet officials, like any other citizen, are charged with knowledge of the law and should be held accountable, where feasible, for their personal misconduct. Halperin v. Kissinger, 424 F.Supp. 838, 843 (D.D.C.1976).
 
 
 13
 The findings of the District Court reflect the conflict and confusion surrounding this area of law. This Court will trace the history and status of this doctrine in both of its forms, absolute and qualified, and then attempt to guide the District Court by showing how we arrive at the answer to the question certified on this appeal. In performing the latter task, the Appellate Court must rely on the District Court's findings of fact. Owen v. Lash, 682 F.2d 648 (7th Cir.1982).
 
 
 14
 The procedural difference between absolute and qualified immunity is important. An absolute immunity defense defeats a lawsuit at the outset, if the official's acts were within the scope of the immunity; on the other hand, the fate of an official entitled to qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial. Imbler v. Pachtman, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976).
 
 
 15
 The Supreme Court has indicated some state officials may be entitled to absolute immunity, while others may be entitled only to a qualified immunity. The distinction is based upon "functional" comparability "with a person" entitled to some immunity. Verner v. Colorado, 533 F.Supp. 1109 (D.Colo.1982). The difficulty in such cases is that "lower federal courts are hopelessly split as to the type of immunity to be accorded to local officials." See, Robert Freilich and Richard Carlisle, Sword and Shield Section 1983 280 (American Bar Assoc. Press 1983).
 
 ABSOLUTE IMMUNITY
 
 16
 Absolute immunity is a doctrine of law which prevents a lawsuit from being maintained against a defendant because of his status and is based upon acts performed within the scope of his authority. The policy underlying absolute immunity is a concern with the chilling effect of potential section 1983 damages litigation upon the exercise of discretionary decision-making. Sheldon Namod, Civil Rights and Civil Liberties Litigation, Sec. 7.01 (Shepards/McGraw-Hill 1979).
 
 
 17
 The Supreme Court has specified that persons such as judges, Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) and Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and prosecutors, Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), are immune from suit under section 1983 if the remedy sought is damages.
 
 
 18
 Occasionally, however, it becomes necessary to decide whether institutions or individuals who analogize themselves to a Court or prosecutor are also protected. Civil Rights and Civil Liberties, supra, at Sec. 7.08. If they perform judicial or prosecutorial duties so functionally comparable to those duties performed by judges and prosecutors that public policy dictates absolute immunity is essential for the conduct of public business, then the Court will be obligated to grant them absolute immunity. Butz v. Economu, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).
 
 
 19
 A trial court with full knowledge of all the facts, must decide in each case whether these functions are sufficiently analogous. The general topic of official liability and immunity is not limited to narrow legal principles, but involves broad considerations of public policy weighed against the actual functions of the official. Sword and Shield, supra, at 313. Moreover, "officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." Butz, 438 U.S. at 506, 98 S.Ct. at 2910. Therefore, in order to determine whether absolute immunity exists in any given situation, the Court must focus not on the title of the official but the particular conduct and circumstances that gave rise to the claim of liability. Lawrence v. Acree, 665 F.2d 1319, 1327 (D.C.Cir.1981); see also Hoke v. Board of Medical Examiners, 445 F.Supp. 1313, 1314 (W.D.N.C.1978).
 
 
 20
 In the present case, Board members contend they are entitled to absolute immunity because they perform investigative and adjudicative functions. The Court will address these two alleged Board functions in depth.
 
 Investigative Functions
 
 21
 Board members maintain they perform some investigative functions and possess the discretionary power to initiate disciplinary proceedings against an individual holding a license to practice medicine in the state of Michigan. Board members contend they will be thwarted in their ability to perform these functions if absolute immunity is not granted. However, Dr. Manion claims that his constitutional rights were violated by the Board's failure to investigate allegations that he was not fit for licensure to practice medicine.
 
 
 22
 Dr. Manion's claim encompasses a period spanning from 1977 until approximately 1981. A review of Michigan statutory law reveals that the Medical Practice Act (the "Act"), 1973 P.A. 185, (codified as amended at Mich.Comp.Laws Ann. Sec. 338.1801 et seq. (1976) ) regulated medical licensing in the state until the latter part of 1978. On September 30, 1978, the Act was replaced by the Public Health Code (the "Code"), 1978 P.A. 368, (codified as amended at Mich.Comp.Laws Ann. Sec. 333.16101 et seq. (1980) ).
 
 
 23
 The district court found that when Dr. Manion left his post at Memorial Hospital in St. Joseph, Michigan, during July of 1976, the Board received notice of his departure by a staff change form submitted by the hospital. This form stated plaintiff had been terminated because of his known drug and alcohol problems and because he had left the community. Further, the district court found such notice required the Board to conduct an investigation into Dr. Manion's qualifications.
 
 
 24
 The Act provided the Board may authorize an investigation in some instances and may actually conduct an investigation to determine qualifications of applicants. Mich.Comp.Laws Sec. 338.1805(b), (f). Moreover, the district court found the Act expressly required that investigations be promptly initiated. In support of this proposition, the district court quoted Sec. 11b(5) which provides in pertinent part:
 
 
 25
 "Within 60 days of receipt of the information, the board shall determine whether or not to institute disciplinary proceedings against the licensee and shall indorse that determination on the licensee's individual historical record. If disciplinary proceedings are authorized, they shall be commenced immediately."
 
 
 26
 The district court found there were no analogous provisions in the Code. Under the Code, the investigative duties are performed by the Department of Licensing and Regulation (the "Department") Mich.Comp.Laws Secs. 333.16221, 333.16231, 333.16233. Thus, under the Code, the Department reports the results of its investigation to the Board which in turn determines if reasons for Board action exist. If the Board determines that such reasons exist, the Board is empowered to hold a hearing and impose sanctions. Mich.Comp.Laws Secs. 333.16221, 333.16226.
 
 
 27
 The Court denies the Board's claim of absolute immunity based on their alleged investigative functions. While it is correct the Act empowered the Board to authorize and/or conduct investigations, that fact alone is not dispositive of the issue before the Court. Indeed, as a general principle, prosecutors acting in their investigative capacities merit only qualified immunity. Windsor v. The Tennessean, 719 F.2d 155, 164 (6th Cir.1983).
 
 
 28
 The Court finds the Board was empowered to initiate proceedings against a licensee under section 11b(5) of the Act and sections 16221 and 16226 of the Code. As previously stated, section 11b(5) provides the Board shall determine within 60 days after it receives information regarding a licensee whether to institute proceedings. If such proceedings are authorized, they must be commenced immediately. Sections 16221 and 16222 of the Code allow the Board to initiate proceedings after it has determined a reason for board action exist. Mich.Comp.Laws Secs. 333.16221, 333.16226. Since both the Act and the Code provide that proceedings be initiated immediately if reasons are found to exist, this function of the Board is not merely ministerial[1] but involves the exercise of discretion.
 
 Adjudicative Functions
 
 29
 Board members maintain they perform various adjudicative functions pursuant to statutory authority. They contend they are empowered to hold hearings which contain the requisite procedural safeguards and make, after reviewing the facts and weighing the available evidence, determinations concerning a licensee's fitness to practice medicine. However, Dr. Manion alleges the Board failed to give him a hearing and determine his fitness to practice medicine until 1981, and then only after he had sought redress in the federal court. Moreover, Dr. Manion contends once he was given a hearing, he was not allowed to present evidence showing he was qualified to practice medicine.
 
 
 30
 A perusal of Michigan statutory law concerning the licensing of physicians indicates the Board does perform certain adjudicative functions. Under the Act, the Board was given the broad power to make determinations necessary to carry out the Act. Mich.Comp.Laws Ann. Sec. 338.1805(a), (j). This broad grant of power implicitly gave the Board the authority to determine if licensees were fit to practice medicine. Pursuant to the Code, the Board was empowered to determine if a violation of the Code had occurred. Mich.Comp.Laws Secs. 333.16221, 333.16226. The Board also had the power to impose sanctions for a violation. Mich.Comp.Laws Sec. 333.16221.
 
 
 31
 The Board, under the provisions of both the Act and the Code, had the power to hold hearings in connection with the denial, issuance, limitation, suspension or revocation of licenses. Mich.Comp.Laws Ann. Sec. 338.1805(a), (b), Mich.Comp.Laws Sec. 333.16232. Similarly, section 13 mandated the Board to hold a hearing "within a reasonable time" in connection with an application for reinstatement of a license. Mich.Comp.Laws Ann. Sec. 338.1813. The Board could grant reinstatement if it determined "the applicant is of good moral character, is able to perform medical services with reasonable skill and safety to the patient, and should be permitted in the public interest to resume the practice of medicine." Id. There is an analogous provision in the Code, section 16247, which substantially tracks the above quoted language found in the Act. Mich.Comp.Laws Sec. 333.16247.
 
 
 32
 Even though the Act and the Code contain similar provisions concerning the Board's power to hold hearings, the Act, unlike the Code, provided hearings were to be conducted pursuant to the Administrative Procedures Act, 1969 P.A. 306, (codified as amended at Mich.Comp.Laws Ann. Sec. 24.201 et seq. (1981) ). However, the Department of Licensing and Regulation did promulgate the Health Code Boards Disciplinary Proceedings, which took effect October 10, 1980. Mich.Health Code Boards Disciplinary Proceedings R. 338.952 (1980). Rule 2 of those regulations provides Board proceedings may be conducted pursuant to the Administrative Procedures Act.
 
 
 33
 The defendants contend the Administrative Procedures Act ensures that the following procedural safeguards afforded are observed at a hearing:
 
 
 34
 (1) the proceedings are conducted by an impartial hearing officer;
 
 
 35
 (2) the case is decided on the record;
 
 
 36
 (3) proceedings are transcribed and preserved as a formal record;
 
 
 37
 (4) parties may present oral and written arguments on issues of law and policy and may present evidence and argument on issues of fact;
 
 
 38
 (5) any alleged constitutional defect may be corrected on appeal.
 
 
 39
 Mich.Comp.Laws Secs. 24.279, 24.285, 24.272, 24.301.
 
 
 40
 As previously noted, the record reflects that even though the Board had received notice as early as July, 1976, that Dr. Manion may have been unfit to practice medicine, the Board, notwithstanding a statutory mandate to do so, allegedly failed to timely investigate this charge and allegedly failed to initiate proceedings against him. The district court found that on March 12, 1979, Dr. Manion received notice from the Board that his license had been revoked in 1978 for failure to timely renew his license. Renewal materials had been sent to Dr. Manion May 26, 1978, although it is claimed he did not receive them until June 6, 1978, leaving him nine days to respond without risking forfeiture of his license. Dr. Manion did not return these materials until November, 1978.
 
 
 41
 The March 12, 1979, letter from the Board stated Dr. Manion would have to petition for reinstatement of his forfeited license in accordance with the Code.
 
 
 42
 On March 28, 1979, Dr. Manion petitioned the Board for reinstatement. The Board, by letter dated July 27, 1979, informed Dr. Manion he was prohibited from practicing medicine until the Board reviewed his file and rendered a decision concerning relicensure.
 
 
 43
 Section 16203 of the Code provides that an individual whose license has been revoked under section 16201 may have his license reinstated "upon showing that [he] ... meets the current requirements for licensure." Mich.Comp.Laws Sec. 333.16203. Moreover, the Board is empowered to "establish criteria which the Board considers equivalent to current educational and practice requirements for evaluating whether an individual shall be relicensed ..." Id.
 
 
 44
 The Board, pursuant to section 16247 of the Code can reinstate the license, if after a hearing, the Board has made certain determinations. Mich.Comp.Laws Sec. 333.16247. As previously noted, this section tracks the language of section 13 of the Act which provided reinstatement hearings must be held within a reasonable time. Mich.Comp.Laws Ann. Sec. 338.1813. Thus, the Board was mandated by statute to provide Dr. Manion a hearing in connection with this reinstatement petition. Consequently, this constituted a discretionary function of the Board which is quasi-judicial in nature.
 
 
 45
 It is clear from the trial record and the state of Michigan's statutory scheme that the Board performs investigative, disciplinary, initiating, and adjudicative functions in determining whether an applicant is fit to practice medicine in the state of Michigan. However, this determination does not end the inquiry of whether the Board is entitled to absolute immunity.
 
 
 46
 Under the rationale of Butz v. Economu, supra, the Supreme Court of the United States made it clear that absolute immunity is only appropriate in those "exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of public business." Butz, 438 U.S. at 507, 98 S.Ct. at 2911. Officials who seek absolute immunity must squarely shoulder the burden of showing that public policy demands an exemption of that scope. Id. at 506, 98 S.Ct. at 2910. The record does not reflect the Board has shouldered this burden.
 
 
 47
 The Court, having weighed considerations of public policy, and applied those considerations to the actual functions of the Board, does not believe a state medical licensing board performing its licensure functions including investigating and initiating disciplinary proceedings and holding hearings in connection with those proceedings constitutes one of those "exceptional situations" delineated in Butz. We think such an official is covered by the general rule that in a lawsuit for damages arising from alleged unconstitutional action, officials exercising discretion are entitled only to qualified immunity. Id. at 508, 98 S.Ct. at 2911; accord Jihaad v. O'Brien, 645 F.2d 556 (6th Cir.1981).
 
 
 48
 We recognize there are cases in other jurisdictions to the contrary. See, e.g., Hicks v. Georgia State Bd. of Pharmacy, 553 F.Supp. 314 (N.D.Ga.1982). However, we think the qualified immunity rule rather than the absolute immunity rule is best applied in situations such as this.
 
 Qualified Immunity
 
 49
 The doctrine of qualified immunity has undergone something of a metamorphosis. Earlier views on the doctrine of qualified immunity have been delineated in a line of Supreme Court decisions. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).
 
 
 50
 This Court, in the case of Jihaad v. O'Brien, 645 F.2d at 561, quoted the previously appropriate standard for determining qualified immunity, as stated in Scheuer v. Rhodes, supra as follows:
 
 
 51
 Any discussion of qualified official immunity should begin with a consideration of Scheuer v. Rhodes, supra. After discussing the reasons for the doctrine of official immunity, the Court stated:These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variations being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.
 
 
 52
 This standard included elements of both objective and subjective tests of good faith.
 
 
 53
 In 1982, in Harlow v. Fitzgerald, supra, the Supreme Court abandoned the subjective prong of the previous objective/subjective standard for determining qualified immunity and placed reliance, instead, upon an objective standard. The present standard is that of determining the objective legal reasonableness of an official's conduct as measured by clearly established law. The law is that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The rationale stated by the Supreme Court in support of shifting away from the objective/subjective standard to an objective standard in determining qualified immunity is as follows:
 
 
 54
 Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.
 
 
 55
 By defining limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."
 
 
 56
 102 S.Ct. at 2738-39 (citation omitted).
 
 
 57
 Dealing with the issue of qualified immunity in the context of a summary judgment proceeding, the District Court, in this case, stated:
 
 
 58
 The defendants have also failed to show that there is no dispute of material fact over their claim of good faith immunity. Harlow v. Fitzgerald, revamped the good faith immunity doctrine. That immunity may be claimed and summary judgment may be granted when a defendant establishes that he neither knew nor reasonably could have known, that his conduct would violate a clearly-established constitutional right of the plaintiff. The clarity of the law guiding a defendant's conduct is thus crucial in determining whether he acted in good faith. 102 S.Ct. at 2739; Hall v. United States, 704 F.2d 246, 250 (6th Cir.1983).
 
 
 59
 Earlier I noted Michigan law dating back to the 1930's which states that the basic elements of procedural due process are notice of the claims against an individual and affording an opportunity to defend against those charges. Given the wealth of guiding authority, I find that a reasonable person could have known that the alleged failures to give plaintiff notice and to conduct timely hearings on those charges would deny plaintiff his procedural due process rights to notice and an opportunity to defend. Defendants' claim for dismissal on the basis of their claimed good faith immunity from suit is consequently denied.
 
 
 60
 We think the District Court, by its ruling denying the Board's motion for summary judgment and dismissal of the lawsuit on the basis of claimed qualified immunity, acknowledged that Board members were entitled to claim the defense of qualified immunity. We agree.
 
 
 61
 The Board obviously exercises discretion in the execution of its statutory duties. It must weigh and assess factual information in reaching its decision whether to institute or not institute disciplinary proceedings against a licensee. The weighing and assessing of factual information and the decision whether to institute disciplinary proceedings involves discretionary functions. The Board is mandated by statute to do more than stamp a complaint filed or simply acknowledge its receipt. It must act according to its statutory directive. The Board, after weighing and assessing factual information against a licensee, may or may not institute disciplinary proceedings. If it does authorize such proceedings, they shall commence immediately.
 
 
 62
 What we perceive the District Court said to the Board in ruling on the claim of qualified immunity in the context of a summary judgment proceeding is simply that the Board at that point in the trial had failed to show there was no dispute of material fact over their claim of good faith immunity. The District Court's ruling is in accordance with this Court's holding in Windsor v. The Tennessean, 719 F.2d at 165 where the Court said "[t]he trial judge is to apply this purely objective test as a matter of law before discovery occurs. If the law which the defendant it alleged to have violated is clearly established, then the qualified immunity defense should fail and discovery should proceed. If the law is not clearly established, the defendant is immune. The Court held that this procedure will adequately protect government officials from insubstantial claims which in the future can be resolved by summary judgment." (citing Harlow, 102 S.Ct. at 2738).
 
 
 63
 In summary, the question certified to this Court by the District Court is whether members of the Michigan Board of Medicine, sued in their individual capacities under 42 U.S.C. Sec. 1983, are entitled to claim the defense of immunity, either absolute or qualified, in the discharge of their duties pertaining to the licensure of persons to practice medicine in the state of Michigan.
 
 
 64
 Our response to the question certified is that members of the Board of Medicine are not entitled to claim the defense of absolute immunity. We find their duties do not rise to that level of governmental responsibility justifying the protection of absolute immunity. However, we hold Board members are entitled to claim the defense of qualified immunity because they do perform discretionary acts in the performance of their statutory duties and this immunity is adequate for their protection.
 
 
 65
 The court having examined the entire record, finds no reversible error in the proceedings presented by this interlocutory appeal. The case is remanded to the district court for further proceedings.
 
 
 
 *
 The Honorable Odell Horton, Judge of the United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 A ministerial act is defined as "one in which a person performs in a given statement of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of his own judgment upon the propriety of acts being done." Adden v. Middlebrooks, 688 F.2d 1147, 1152 (7th Cir.1982) (citations omitted)