**Morton HALPERIN, et al., Plaintiffs,**

v.

**Henry A. KISSINGER, et al.,
Defendants.**

**Civ. A. No. 73–1187.**

United States District Court,
District of Columbia.

Oct. 25, 1989.

Mark H. Lynch, Covington & Burling, Washington, D.C., for plaintiffs.

Larry L. Gregg, U.S. Dept. of Justice, Civ. Div., Torts Branch, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

*Background*

This case was filed in 1973 and, therefore, has its origins in the dim past. During the intervening period of more than sixteen years, it has been the subject of three decisions by the District Court[1] and two by the United States Court of Appeals for the District of Columbia Circuit.[2] Plaintiffs are Morton Halperin, formerly the Chief of the National Security Council (NSC) Policy Planning Group during the formative months of the Nixon administration, Ina Halperin and their children. Since

---

1. *Halperin v. Kissinger,* 424 F.Supp. 838 (1976); *Halperin v. Kissinger,* 434 F.Supp. 1193 (1977); and *Halperin v. Kissinger,* 578 F.Supp. 231 (1984).

2. *Halperin v. Kissinger,* 606 F.2d 1192 (D.C.Cir. 1979) (*"Halperin I"*); *Halperin v. Kissinger,* 807 F.2d 180 (D.C.Cir.1986) (*"Halperin II"*).

the case's inception, a number of the original defendants, including former President Nixon, have been dropped and there now remain only Henry A. Kissinger and H.R. Haldeman.[3]

The plaintiffs' claim is predicated upon defendants' alleged institution of a wiretap of plaintiffs' home on May 9, 1969, which was continued until February 10, 1971, a period of twenty-one (21) months. Plaintiffs assert that this wiretap violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20, and also the Fourth Amendment of the Constitution, which prohibits unreasonable searches and seizures. In October 1987, following the remand of the court of appeals in *Halperin II* in 1986, defendants filed a motion for partial summary judgment. While plaintiffs do not dispute many of the facts upon which defendants rely, they argue that unresolved factual disputes preclude summary judgment. The matter has been extensively briefed. On March 1, 1988, the District Court (Judge John Lewis Smith) heard argument. Thereafter the case was transferred to this Court. Subsequently, both parties submitted proposed findings of fact and conclusions of law.

*The Remaining Issues*

By virtue of the remand in *Halperin II*, the issues pending have now been sharply narrowed.[4] More specifically, the appellate court ruled the defendants were entitled to summary judgment for the *initiation* of the Halperin wiretap. *Halperin II* at 190–191. Addressing the defendants' entitle-ment to qualified immunity for *continuation* of the wiretap, it directed this Court to determine:

> the period (beginning with the wiretap's initiation and ending no later than May 1970) during which no reasonable jury could find the wiretap's putative national security purpose objectively unreasonable. As to that period, summary judgment against plaintiffs will lie on the Title III claim....

and:

> the portion of that period [May 9, 1969–May 1970] for which defendants are entitled to summary judgment on the fourth amendment reasonableness claim because no reasonable jury could find that the wiretap violated what the *Halperin I* court found to have been the clearly established reasonableness standards.[5]

807 F.2d at 194.

The balance of the entire period running from May 1970 to February 10, 1971, was held in *Halperin II* not capable of summary judgment on either the Title III claim or the fourth amendment reasonableness claim. *Id.*

Both this Court and the court of appeals have recognized that the purpose of the Halperin wiretap is paramount in determining defendants' entitlement to qualified immunity. As previously indicated, this determination has been complicated by the Supreme Court's reformulation of the qualified immunity doctrine since this case began. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). While the actor's subjective intent has been

---

3. Since the third remaining defendant, John N. Mitchell, has died, and plaintiffs have made no move to substitute in Mitchell's place, we can safely assume that John N. Mitchell is not a party in the pending litigation.

4. As a result of the 1984 decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the court of appeals stated: "The central issue is what standard *Harlow*, which stripped the qualified immunity defense of its subjective element, prescribes on summary judgment where an asserted national security purpose is challenged as pretextual." *Halperin II*, 807 F.2d at 182.

5. In so doing, a majority of the court of appeals applied the "law of the case" doctrine in spite of the fact that the same court in three other cases involving national security wiretaps—two of which wiretaps were conducted contemporaneously with this one (*see Sinclair v. Kleindienst*, 645 F.2d 1080 (D.C.Cir.1981), and *Zweibon v. Mitchell* ("*Zweibon IV*"), 720 F.2d 162 (D.C.Cir. 1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984)), as well as one conducted several years after the Halperin tap (*Chagnon v. Bell*, 642 F.2d 1248 (D.C.Cir.1980), *cert. denied*, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981))—held that "[i]t is plain ... that there existed no clearly established ... reasonableness requirements at the time...." *Zweibon IV*, 720 F.2d at 170.

the traditional focus, the Supreme Court in *Harlow* "rejected inquiry into state of mind in favor of a wholly objective standard." *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). In national security cases, "a purely objective inquiry into the pretextuality of the [claimed national security] purpose is appropriate." *Halperin II,* 807 F.2d at 188. Defendants' actual purpose, which looks to subjective intent, is irrelevant. *See Smith v. Nixon* ("*Smith II*"), 807 F.2d 197, 201 n. 2 (1986). The "objective reasonableness of [the] national security motivation is all that need be established...." *Id.* at 200, citing *Halperin II,* 807 F.2d at 188.

## FINDINGS OF FACT

*The Wiretap's National Security Predicate:*

1. In late April 1969, President Nixon met with his Attorney General, his Assistant for National Security Affairs and the FBI Director to discuss what could be done about leaks which Nixon believed were endangering the conduct of foreign policy. Based on FBI Director Hoover's statement that wiretaps had been used in prior administrations to investigate leaks and Attorney General Mitchell's assessment that the wiretaps would be lawful, Nixon authorized the FBI to initiate an investigation, which would include the use of wiretaps, when the next major leak occurred.

2. On May 9, 1969, a wiretap was initiated on the residence telephone of Morton Halperin, who at that time was the Chief of the Planning Group for the NSC staff. Earlier that day, the *New York Times* had reported that the United States was bombing Vietnamese sanctuaries inside the Cambodian border. Halperin was aware of the divergent views among military and intelligence officials regarding the importance of the sanctuaries, had access to option papers discussing the possibility of a Cambodia bombing operation, knew about the bombing and was believed to be a potential source of the Cambodia bombing story. Halperin also had been singled out by FBI sources in the news media as one of the individuals who might have provided infor-

mation to the story's author, Halperin's former college roommate William Beecher. The court of appeals affirmed the grant of summary judgment as to the initiation of the wiretap. *Halperin II* at 194.

3. On May 28, 1969, the FBI reported that Halperin had agreed to help a reporter track down an internal Department of Defense cable on Vietnam. The FBI also reported that in another conversation, with a former colleague who was then out of government, Halperin had been overheard discussing an arms control report which was scheduled for NSC consideration, confirming a contingency plan for the use of force against the Soviet Union in the event of an invasion of an Eastern European country, and describing in detail internal disputes over military and foreign policy.

4. Halperin's conversations prompted immediate concern. In his May 28 letter and May 29 follow-up letter to President Nixon and Dr. Kissinger, FBI Director Hoover advised that the reporter may have been working under the guidance of a foreign intelligence service. (In light of the information contained in the classified portions of those letters, Hoover's concerns were not unreasonable.) On June 2, a few days after Hoover sent his letters, Nixon's chief administrative assistant, H.R. Haldeman, noted a conversation in which the President expressed his concerns: "Big problem re leaks in Ks operation. Gave me a couple of reports—very hard to know how to handle. Fear a couple may be conscious or unconscious agents. Wants me to talk [with] K." Two days later, on June 4, Alexander Haig noted in a "Talking Points" memo for Kissinger that although Halperin had not been "firmly linked with a security breach," he had been "involved in indiscretions." Haig recommended that the wiretap of Halperin be continued "for at least another two weeks so that a pattern of innocence can be firmly established."

5. During the Spring and Summer months of 1969, leaks of foreign policy and military matters continued to concern the President and his national security officials. These included leaks about strategic

arms and troop withdrawal plans and initiatives, areas in which Halperin had worked.

6. Halperin was a potential source of these leaks. Although his access to some of the most sensitive projects had been limited after the Cambodia bombing article appeared, he continued to have access to sensitive information on a wide variety of subjects. Materials Halperin later deposited with the National Archives, for example, reveal that he possessed the May 28, 1969, TOP SECRET National Security Decision Memorandum (NSDM) on Okinawa, which was leaked and reported in Hedrick Smith's June 3, 1969, article in the *New York Times*. Halperin's access to classified documents included such matters as the relaxation of economic controls against the People's Republic of China (June 26, 1969, NSDM 17), strategic and tactical nuclear policy in Asia (July 7, 1969, Memorandum for Kissinger) and current materials on troop withdrawal. The latter included Dr. Kissinger's briefing memorandum to the President for his meeting with Secretaries Rogers and Laird, Generals Wheeler and Cushman (CIA Deputy Director) and Attorney General Mitchell, where the whole issue of Vietnamization and troop withdrawal figures would be discussed.

7. By July 8, 1969, FBI Assistant Director Sullivan, who had been placed in charge of the wiretap operation, was reporting to Hoover that "we know that Halperin cannot be trusted. We have learned enough already from the early coverage of him to conclude this." In his letter to Hoover, Sullivan opined that Halperin knew about the wiretap because he was saying much less on the phone. A few weeks later, on August 22, 1969, the FBI learned that Halperin had told a former colleague about a message from General Wheeler, the Chairman of the Joint Chiefs of Staff, to General Abrams, Commander of United States forces in Vietnam. Halperin revealed that Wheeler had instructed Abrams that something had to be done to permit the United States government to say that it had made deescalatory moves.

8. In mid-September 1969, Halperin left his full time position with the NSC staff. Leaks on foreign policy matters continued and remained a concern for administration foreign policy makers through May 1970. These included leaks on strategic arms, troop withdrawal, long range China policy and other matters which were being planned and considered while Halperin was on the staff and in which he was involved as the Chief of Policy Planning. Of particular concern to the President were leaks that might jeopardize the SALT negotiations, and specific directives about leaks were issued by him and Kissinger in October 1969 and May 1970. Halperin was not implicated in any of these leaks.

9. Although Halperin had left the NSC staff, he remained a potential source of leaks. He was a consultant with the NSC (through May 1970) and retained a TOP SECRET security clearance. Although Halperin points out that he only was used as a consultant on one occasion and the FBI knew that he had declined a briefing during a visit to Japan, the FBI could have concluded that Halperin's former NSC colleagues might have been confiding in him regarding matters he worked on while he was with the staff. The FBI also knew from the wiretap that Halperin had taken his personal file of classified documents when he left the NSC, depositing them first with the Rand Corporation and later with the National Archives. These documents, which reveal the breadth of Halperin's knowledge and insights into the long range strategies of administration foreign policy in such sensitive areas as SALT negotiations, made him a potential source of leaks long after he left government.

10. After Halperin left the NSC staff in September 1969, the wiretap produced information about Halperin's increasing opposition to administration policy on Vietnam. The FBI could have interpreted this information as showing, in varying degrees, a potential motive by Halperin to leak. This motivation would have been apparent, for example, in Halperin's comment in May 1970 that he was "becoming a 'revolutionary or at least a radical,'" which he defined as "'telling the truth in simple

language.'" The FBI also reported discussions in which Halperin potentially revealed his insider's knowledge on troop withdrawal and initiatives in Vietnam.

11. Through May 1970, the wiretap also produced leads regarding leaks by persons other than Halperin. In late May 1969, for example, the FBI learned that a proposal to use armed force in order to repel a Soviet invasion of an Eastern European country (which Halperin confirmed) had been disclosed to a person outside government. The possibility that someone other than Halperin might be leaking insider information also arose in late December 1969, when the FBI learned and reported that a person who was meeting with Kissinger also was actively involved in opposing administration policy on Vietnam. This occurred at a delicate point in the Nixon administration's closely guarded attempt to establish secret peace talks with North Vietnam.

12. The actual monitoring operation was supervised by Ernest Belter of the FBI's Washington Field Office. Belter had prior experience with wiretaps in leaks investigations and was instructed that this, too, was a leak case. He instructed his monitors that the wiretap was concerned with intentional leaks as well as unintentional leaks or indiscreet talk on matters such as Vietnam, the Cambodia bombing, strategic arms limitations and foreign affairs matters. The FBI's monitors were not privy to sensitive foreign policy plans and initiatives, and accordingly relied on newspapers to keep themselves current and in a position to detect possible leaks.

13. Belter was interested not only in finding actual evidence of leaks, but also in determining whether a person had a motive to leak. Accordingly, he instructed his monitors to log conversations that reflected an attitude toward the administration, including contacts and involvement with opposing political camps, because a subject's frame of mind would be relevant to a potential motivation to leak. At the same time, Belter instructed his monitors that he was not interested in sex and similar matters.

14. Belter expected that monitors would not change the type of information they would log simply because a person left government service. Belter assumed that the subject still retained a considerable bit of knowledge after he left. Belter also assumed that a person leaving government might take documents with him and in mid-September 1969 learned that Halperin had done that.

15. Many of the conversations logged, including many of the conversations between the adult plaintiffs, were obviously of short duration. Belter expected his monitors to log occasional conversations or "no value calls" when there was no significant activity, in order that he would know that the wiretap was still operational. This had been a problem very early with the Halperin wiretap. Moreover, it is apparent from reading the logs of the wiretap that often conversations were too short to allow effective minimization.

16. Belter did not instruct his monitors to omit logging of conversations between the adult plaintiffs or conversations of Ina Halperin with others. Although plaintiffs point out that Ina Halperin did not have a security clearance, the FBI could have concluded that these conversations might provide information about Morton Halperin's activities relative to leaking. In one instance, for example, the adult plaintiffs discussed whether William Beecher would reveal his sources. In another instance, the FBI logged and reported a conversation in which Ina Halperin told a third person that the President would be making a major speech on Vietnam, which she apparently had learned from her husband, who was working on the speech.

17. Although the amount of conversations logged dropped off after Halperin left the NSC staff in September 1969, Halperin testified that he actually increased his use of the phone.

18. The principal minimization occurred after the logs were prepared and transmitted, on a daily basis, to Assistant Director Sullivan's office. At that point the logs would be reviewed by an agent working for Sullivan, Bernard Wells, who would pre-

pare draft summary letters as appropriate. The overwhelming majority of the 638 conversations logged by the monitors were never transmitted or reported in the summary letters. Defendants assert that only approximately six percent of the adult plaintiffs' conversations that were logged, for example, were included in the summary letters. Although plaintiffs say they dispute the calculation, they offer none of their own. Regardless of the actual figure, it is apparent from even a cursory comparison of the logs and summary letters that most of plaintiffs' conversations were excluded from the summary letters. Very few of the minor plaintiffs' conversations were overheard on the wiretap, and none were included in the summary letters.

19. When the use of wiretaps was discussed in late April 1969, President Nixon assigned FBI Director Hoover the responsibility for recommending when a wiretap should be removed once it no longer was producing information that was useful to the investigation. The FBI did recommend that other wiretaps be removed. In his July 8, 1969, letter to Hoover, for example, Sullivan noted that he had previously recommended that certain wiretaps be discontinued and recommended that "some" additional coverage be removed. As to the Halperin wiretap, however, Sullivan advised that the early coverage had been productive and that Halperin and one other person (who had been overheard on the Halperin wiretap) presented the greatest concern. Thus, although it appears from deposition testimony in this case and internal FBI documents that occasional questions about the continued utility of the Halperin wiretap were raised, a recommendation to terminate the surveillance was not made until February 10, 1971.

20. When the leaks problem was discussed in late April 1969, President Nixon instructed Hoover to investigate the leaks and authorized the use of wiretaps by the FBI in accordance with Department of Justice procedures once the Attorney General approved a surveillance request. The Halperin wiretap was approved by then Attorney General Mitchell on May 12, 1969. This authorization was in writing, and nu-

merous memoranda were generated within the FBI on information derived from the wiretap. These records were maintained "in a security, [sic] off-the-record capacity." Hoover had told Nixon that wiretap records were closely held in earlier leaks investigations, and Nixon instructed Hoover that the same should be done here. At his deposition, Nixon explained that he was concerned that, in the event the wiretaps became public, foreign officials would conclude that the administration did not trust its own officials and consequently would not deal with foreign officials in confidence. Nixon asserted that this would have had a serious deleterious impact on the conduct of foreign policy.

21. Under Department of Justice procedures in effect when the Halperin wiretap was approved, an Attorney General's authorization was valid for ninety days. At the end of ninety days, the FBI was under an affirmative obligation to terminate the wiretap automatically unless a further ninety day period was authorized by the Attorney General. This procedure arose under Attorney General Katzenbach, who established a six month period for wiretaps. Attorney General Clark reduced this to a three month period. Under the Clark procedure, the FBI only had to submit quarterly lists of wiretaps it wished continued. Internal Department of Justice memoranda reflect that Mitchell was apprised of the ninety day rule shortly after he became Attorney General. He tightened this procedure by requiring separate ninety day renewal requests for each national security wiretap, rather than the quarterly lists that Clark had accepted. This requirement was confirmed in Hoover's June 10, 1969, memorandum to Mitchell, Hoover's June 28, 1969, conversation with Mitchell's secretary and Mitchell's July 7, 1969, memorandum to Hoover.

22. Although existing Department of Justice practice and procedure clearly required the FBI to terminate the Halperin wiretap after ninety days unless FBI Director Hoover requested and received the Attorney General's renewal authority, this was not done. This was "an off the books"

wiretap conducted outside the purview of the Justice Department's procedures. It was so sensitive that it was to be handled on a "need to know" basis, with no record maintained. Sullivan, who apparently acted *de facto* as the case agent, testified about his own uncertainty as to why the wiretap was continued, and without the benefit of Hoover's own testimony the reason is not determinable in this case. Belter testified that wiretaps were periodically reviewed on the basis of costs and justification, and this would lead to renewal requests. This review would have been the responsibility of the case agent in the first instance. It does not appear that any single person formally was assigned as a case agent on the leaks investigation, however. Belter's sole responsibility was to supervise the actual monitoring operation, and he normally would not prepare the periodic review forms. Wells, who did not have prior experience with national security wiretaps, only was assigned to draft summary letters.

23. Although the wiretap continued beyond his ninety day authorization, Mitchell was not aware of that fact. The records of national security wiretaps in the Attorney General's office were maintained by Mitchell's secretary. Those records were incomplete. In order to straighten them out Mitchell's secretary called Hoover on June 28, 1969, to see if Mitchell's office was going to get a new list of wiretaps from the FBI or whether she would have to prepare one. After Hoover said that individual requests would be sent over in the future, Mitchell requested the FBI to send an overall list of approved wiretaps for his records. On July 10, 1969, Hoover sent the list. His cover memorandum advised that the list covered all wiretaps being operated on renewal authority as well as the wiretaps being operated under an initial authorization. The Halperin wiretap was not listed as a pending wiretap, however.

24. Over the entire course of the wiretap, only five documents were sent by the FBI to the Attorney General's office concerning the Halperin wiretap after it was authorized. Three were summary letters, dated August 6, 1969 (a copy of the August

1 overall summary letter of all wiretaps), December 29, 1969, and May 4, 1970. One was a memorandum dated September 15, 1969 and the other, dated February 11, 1971, reported that the FBI had discontinued the wiretaps. Three of them were outside the ninety-day period for reauthorization or termination of the wiretap. Unlike the authorization request, none of these memoranda on their face solicited action by the Attorney General. Mitchell testified that he did not recall seeing any of these documents and explained that these were the type of documents which his secretary would screen and file in the safe in the Attorney General's anteroom. Mitchell also testified that he did not have time to read everything addressed to the Attorney General, and the record contains similar testimony from Attorney General Clark. In light of all this, the sole fact that the FBI's documents were addressed to the Attorney General is insufficient to justify an inference that Mitchell actually saw them.

25. When President Nixon authorized the use of wiretaps in the leaks investigation, he instructed that the FBI should provide any information it thought important to Kissinger, his Assistant for National Security Affairs. Over the course of the wiretap, fifteen summary letters were addressed to Kissinger by the FBI. These were duplicates of letters addressed to Nixon, and all were sent before May 12, 1970, when Haldeman was chosen as the sole recipient of FBI summary letters. During this period, Kissinger was responsible for making the NSC machinery work and served as the President's alter ego on virtually every matter involving national security and foreign policy. The summary letters sent to Kissinger, approximately one a month, constituted an exceedingly small fraction of the hundreds of documents that required his attention.

26. Defendants claim that Kissinger did not assume an active role in continuing the wiretap after May 9, 1969. Plaintiffs dispute this, citing three documents authored by Sullivan, dated July 8, 1969, September 15, 1969, and February 10, 1971, in which

Sullivan reports contacts with Haig regarding discontinuation of wiretaps.

27. Documentary evidence and Nixon's and Mitchell's deposition testimony demonstrate that Kissinger was responsible not only for suggesting names of those to be wiretapped but also for determining when to terminate the particular surveillances. This is consistent with the FBI's view of the structural relationship, which was ambiguous. According to FBI memoranda, Kissinger exercised authority to discontinue certain surveillances, while continuing the Halperin wiretap despite the FBI's views as to the usefulness of the wiretaps and Kissinger's own view that the Halperin wiretap was of marginal utility.

28. Kissinger did not know the internal Department of Justice procedures designed to govern national security wiretaps. He did understand from the late April 1969 meeting with Hoover that wiretaps had been used to investigate leaks in the past and that there was an established practice for such matters which included Attorney General approval. Although the FBI continued the wiretap without receiving the Attorney General's periodic renewal authority, the FBI's summary letters to Kissinger did not reflect this; and Kissinger had no reason to conclude that the FBI was treating this wiretap any differently than other national security wiretaps it had conducted.

29. Prior to May 12, 1970, Haldeman did not have any formal responsibilities regarding the Halperin wiretap. He took no part in either the initiation of the Halperin wiretap or, prior to May 12, 1970, its continuation. He did become aware of wiretaps early on but plaintiffs agree that he understood they were being conducted in light of the national security consequences arising from leaks. Haldeman's contemporaneous notes also reflect that this concern was expressed to him by the President in early June 1969 when Nixon raised the problem of leaks in Kissinger's shop and showed Haldeman two of the summary letters that raised the possibility that people on Kissinger's staff might be conscious or unconscious agents.

30. Prior to May 1970, Haldeman also was given Hoover's December 29, 1969, summary letter. This letter reported that former Secretary of Defense Clark Clifford was preparing an article attacking administration policy on Vietnam and that one of the persons working with Clifford was meeting with Kissinger. At the suggestion of Ehrlichman (who, as the White House contact with the Department of Justice, received the summary letters addressed to the President), Haldeman had his assistants prepare a game plan. Haldeman used game plans as a problem solving management technique, and often several game plans would be prepared on any given day. Although this has been described as evidencing a political purpose in continuing the wiretap, Haldeman testified that the letter raised a concern that Clifford's article might disclose internal opposition to the administration's rejection of a final troop withdrawal date, which could have stiffened North Vietnamese unwillingness to engage in secret talks or possibly even have revealed Kissinger's efforts to set up those negotiations. There is no evidence that anything was done with the information provided in Hoover's letter. In any event, Haldeman had not been given any responsibility for the wiretap at that time, and consequently his actions, however they might be characterized, are immaterial to ascertaining the wiretap's purpose.

31. On May 12, 1970, President Nixon decided that the FBI's summary letters should only be sent to Haldeman. At the time, there still was a concern with leaks. This is apparent from Kissinger's directive cautioning officials about statements that might endanger the SALT talks and Hoover's May 13, 1970, memorandum to Sullivan on the reporting change, which states that Nixon still was concerned with leaks occurring at that time. Plaintiffs now concede that Haldeman was chosen because he was one of the very few persons who was privy to all foreign policy issues and because both Kissinger and Hoover had confidence in Haldeman.

32. Haldeman's notes and journal entries for May 12, 1970, record that his

responsibility was to serve as a conduit and decide whether any of the information reported by the FBI should be disseminated further. There is no evidence that Nixon instructed Haldeman that he had any responsibility for the terminating of the wiretap. Haldeman knew the President still was concerned with foreign policy leaks and relied on the FBI to make any investigative judgments. At the same time, as Judge Smith originally found, Haldeman reviewed the material "for over a year [Sic. 9 months] without recommending termination and ... disseminated the material for purposes unrelated to the tap's original justification." *Halperin v. Kissinger*, 424 F.Supp. at 845 (D.D.C.1976).

## CONCLUSIONS OF LAW

1. Plaintiffs seek damages for a wiretap that originally was at issue in *Ellsberg v. Mitchell*, 670 F.Supp. 1 (JHP) (D.D.C. 1984), in which Morton Halperin was a plaintiff. Although Ellsberg's own claim for damages as a result of overhearings on the Halperin wiretap were adjudicated in the *Ellsberg* action (pertinent portions of the record in *Halperin* were made a part of the record and considered by this Court in *Ellsberg*), Halperin dismissed his claims in *Ellsberg* in order to file this action. The case was assigned to the Hon. John Lewis Smith, United States District Judge, and has now been reassigned to this Court. Prior proceedings have narrowed the issues in this case substantially. Plaintiffs no longer assert claims against President Nixon, who authorized the use of the wiretaps and took responsibility for them, in light of the Supreme Court's recognition of a constitutionally based doctrine of presidential immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). With respect to the issue of damages, and specifically punitive damages, Judge Smith early on ruled that the conduct of the wiretap "cannot fairly be characterized as a wanton, reckless or malicious disregard of plaintiffs' rights justifying the imposition of punitive sanctions." *Halperin v. Kissinger*, 434 F.Supp. 1193, 1195 (D.D.C.1977). Although the court of appeals reversed that ruling and remanded

for consideration of proper damages, *Halperin I*, 606 F.2d 1192, 1207–08, 1214 (D.C.Cir.1979), *aff'd by an equally divided court*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), it did not address the specific issue of punitive damages.

2. In its present status, this case is on remand from the court of appeals' decision in *Halperin II*, 807 F.2d 180 (D.C.Cir.1986). The matter is before the Court on defendants' motion for partial summary judgment. Their motion urges that the qualified immunity doctrine announced in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), protects them from liability for the continuation of the Halperin wiretap because the wiretap retained its national security purpose and did not violate established reasonableness standards. Pursuant to the Court of Appeals' remand instructions, this Court must reconsider defendants' entitlement to qualified immunity for the continuation of the Halperin wiretap through May 1970. The justification for continuing the wiretap *after* May 1970 has been remanded for trial. Defendants also raise a second argument. Citing *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), each defendant individually urges his entitlement to summary judgment on the ground that he was not responsible for the continuation of the Halperin wiretap.

3. In considering defendants' entitlement to summary judgment for the period from May 9, 1969, to May 1970, this Court "look[s] at the evidence in the light most favorable to, and drawing all inferences most favorable to," the nonmoving parties. *Halperin II*, 807 F.2d at 189. At the same time, while plaintiffs are entitled to all "justifiable" inferences, the Supreme Court recently has taught that district courts must be sensitive to the possibility that the "range of permissible inferences" which could be drawn might be limited by the substantive law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). For example, *Halperin II* makes any inference that defendants' *actual motive* was improper, imma-

terial and insufficient to defeat summary judgment. Additionally, it is important that this is a nonjury case where the basic evidentiary facts are undisputed and the disagreement between the parties concerns the proper inferences which should be drawn from those facts.

*The "purpose" issue*

■ 4. Although this case has been pending for over sixteen years, a threshold question of immunity remains unresolved. This issue has been complicated by superior court decisions that have reformulated and refined the essential inquiry which district courts must undertake in considering a claim to qualified immunity. Under the *Harlow* test, an official is entitled to qualified immunity from personal liability as a matter of law as long as his actions do not violate constitutional rights that were "clearly established" when he acted. 457 U.S. at 818, 102 S.Ct. at 2738. After the Supreme Court's decision in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and decisions of the district court and the court of appeals anticipating the holding in *Mitchell* (*see, e.g., Sinclair v. Kleindienst*, 645 F.2d 1080 (D.C.Cir.1981); *Zweibon IV*, 720 F.2d 162 (D.C.Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984)), plaintiffs concede, as they must, that there was no clearly established warrant requirement applicable to national security wiretaps prior to the Supreme Court's decision in *United States v. United States District Court* ("*Keith*"), 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *See Halperin II*, 807 F.2d at 191. In order for defendants to receive the benefit of this immunity, a court must conclude that the purpose of the wiretap was national security. If this was the purpose of the Halperin wiretap, that disposes of plaintiffs' claim for damages under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20. How a court resolves this issue of purpose consistently with *Harlow*'s "wholly objective standard" (*Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984)) was a focal point of the last appeal.

5. The court of appeals' companion decisions in *Halperin II, Smith II,* 807 F.2d 197 (D.C.Cir.1986), and *Ellsberg v. Mitchell* ("*Ellsberg II*"), 807 F.2d 204 (D.C.Cir. 1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987), now hold that in national security cases "a purely objective inquiry into the pretextuality of the [claimed national security] purpose is appropriate." *Halperin II*, 807 F.2d at 188. A defendant's *actual* purpose, which turns on subjective intent, is "irrelevant." *Smith II*, 807 F.2d at 201 & n. 2. The "objective reasonableness of national security motivation is all that need be established...." *Id.* at 200, citing *Halperin II*, 807 F.2d at 188. This immunity can be determined on summary judgment where there is no genuine issue of material fact which would allow a reasonable jury to "conclude that it was objectively unreasonable for the defendants to be acting for national security reasons." *Halperin II*, 807 F.2d at 189. Once the "[d]efendants have alleged sufficient objective facts to place the wiretap ... in a rational national security context," the burden shifts to the plaintiffs to point to "objective facts that suggest a conclusion [to the] contrary." *Ellsberg II*, 807 F.2d at 207.

6. *Halperin II* sustained Judge Smith's earlier ruling that qualified immunity protects defendants from liability for the initiation of the Halperin wiretap. The court of appeals concluded that "no reasonable jury could fail to find that there were reasonable national security grounds" for initiating the wiretap. 807 F.2d at 191. The court of appeals also opined that "the greater the initial suspicion the longer a wiretap may be justified to establish that the suspicion is unfounded." *Id.* Plaintiffs argue that national security concerns about Halperin as a potential leaker could not be justified after June 3, 1969. They point to the "facts" that Halperin had had "no access to sensitive information relating to any subject" after early May 1969 and that defendants had acknowledged that three weeks of wiretapping had "failed to reveal any indiscretions" on Halperin's part. They also emphasize Halperin's loyalty and discretion as attested by the sub-

sequent testimony and evidence from Kissinger and Haig and the unproductivity of the wiretap. The record demonstrates that this argument does not conclude this matter. As noted earlier, in late May 1969 the FBI overheard two conversations which caused legitimate concern. In one conversation, Halperin agreed to get a Defense Department cable for a reporter whom Hoover identified as a possible agent of a foreign intelligence service. Later that same day, Halperin had an extensive conversation with a former colleague in which he evidenced a willingness to discuss obviously sensitive matters, such as a plan to use armed force against the Soviet Union, with persons outside government. Halperin's indiscretions were noted by both Sullivan and Haig in memoranda preparing Hoover and Kissinger for their June 4, 1969, meeting and apparently were of sufficient concern to President Nixon to prompt him to discuss the problem of leaks with his chief administrative assistant, Haldeman. Plaintiffs' further assertion that Halperin lacked current access to sensitive information after May 1969 also is refuted by the record. The documents which Halperin took from NSC files when he left the staff in September 1969 and ultimately deposited with the National Archives under a "Deed of Gift" conclusively demonstrate that Halperin received access to classified documents on a variety of subjects throughout his NSC tenure. Indeed, the court of appeals in *Halperin II* (807 F.2d at 190–91) already has noted that Halperin possessed the May 28, 1969, TOP SECRET National Security Decision Memorandum (NSDM) on President Nixon's decision to adopt a fallback position in negotiating the reversion of Okinawa to the Japanese (the documents Halperin placed with the National Archives reveal that he was a junior member of the negotiating team on the Okinawa issue during the Johnson administration). *See also Smith II*, 807 F.2d at 199. That decision was leaked and reported in the *New York Times* on June 3, 1969. Because Halperin was a potential source of that leak, plaintiffs' argument that continuation of the wiretap after that date could

not be justified by national security concerns is without merit.

7. The Court also concludes that it was objectively reasonable to continue the wiretap out of a concern with national security through the remainder of Halperin's tenure with the NSC staff. This is not a case where a wiretap is continued indefinitely while the FBI attempts to confirm that its initial suspicions are unfounded. Sullivan's July 8, 1969, letter to Hoover is unequivocal that the FBI had concluded from the early coverage that Halperin "could not be trusted." This judgment could not be characterized as unreasonable in light of Halperin's conversations in late May 1969. It is immaterial that Halperin only might have been indiscreet and may not have been intentionally leaking. The Supreme Court long ago recognized that rational national security concerns arise as much with the person who talks too freely as with the person who, for reasons of disloyalty or disagreement with policy decisions, intentionally discloses information that must be kept confidential. *See Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 899, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230 (1961). Halperin's knowledge of critical foreign policy plans and initiatives made him a potential source, intentional or otherwise, of the continuing leaks throughout the Summer of 1969. In late August 1969, for example, Halperin revealed that the Chairman of the Joint Chiefs of Staff had instructed the Commander of United States forces in Vietnam to do something that would allow the government to say it had taken deescalatory actions, information that would have been of obvious interest to our adversaries in Vietnam. In these circumstances, "no reasonable jury could fail to find that there were reasonable national security grounds" for a wiretap out of a concern with leaks. *Halperin II*, 807 F.2d at 191.

8. The Court also concludes that these concerns did not abate with Halperin's departure from the NSC staff in September 1969. From September 1969 until May 1970, Halperin was an NSC consultant and retained a TOP SECRET security clearance. Not only was he exposed to classi-

fied information but also the distinct possibility existed that he was continuing to receive sensitive information on foreign policy matters, either officially or in informal discussions with his former NSC associates. Moreover, defendants have pointed to documents among the Halperin NSC materials which establish that his NSC tenure during the formative months of Nixon foreign policy making had given him knowledge of long range policies and plans on specific matters such as strategic arms negotiations, troop withdrawal, China policy and other matters—knowledge that made him a potential source of the leaks on these subjects long after he left government. This is precisely the type of *particularized* showing which *Halperin II* recognized would have a "bearing on the objective reasonableness of the national security purpose." 807 F.2d at 190. The FBI also knew that Halperin had taken classified documents with him and found increasing evidence of a potential motive to leak as a result of, in Halperin's own terms, his becoming a "radical" on the Vietnam issue.

9. The Court's conclusion is not altered by plaintiffs' argument that many of the conversations reported by the FBI involved matters of political interest. Plaintiffs, for example, condemn the FBI for reporting Halperin's revelation of General Wheeler's instructions to General Abrams on de-escalation because this information "was personal and political in nature." "Political" and "national security," of course, are not mutually exclusive terms. While the possibility of de-escalation in Vietnam had obvious political overtones, the premature disclosure of the government's intentions would have had equally obvious military and foreign policy consequences. In another context, the court of appeals has followed recent Supreme Court pronouncements on standards for awarding summary judgment and concluded that the substantive law can limit "the range of inferences a trial court may draw" in considering whether genuine issues of material fact warrant the denial of a defendant's claim to qualified immunity. *Martin v. D.C. Metropolitan Police Department,* 812 F.2d 1425, 1435 (D.C.Cir.1987). In

light of the executive's broad discretion and greater experience with national security matters (*see, e.g., CIA v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985); *Halperin v. CIA,* 629 F.2d 144 (D.C.Cir. 1980)), the Court concludes that this rule is equally apropos in suits which question actions that purportedly were taken in the interest of national security. Where a report potentially implicated national security then, plaintiffs do not create a genuine issue of material fact by suggesting without more that some other interpretation also was possible. This type of showing may be relevant to the *actual* purpose in continuing the Halperin wiretap, but *Halperin II* makes that immaterial to the qualified immunity issue that is before this Court.

10. The Court accordingly concludes that defendants cannot be held liable for the continuation of the wiretap through May 1970. As with the decision to initiate the wiretap, "a reasonable jury might disagree" with the continuation of the wiretap, "[b]ut no reasonable jury could fail to find that there were reasonable national security grounds" for doing so. *Halperin II,* 807 F.2d at 191. Given Halperin's early indiscretions, his increasing motivation to leak, his insider knowledge that made him a potential source of the leaks that continued to plague foreign policymaking and the fact that the wiretap did produce information relative to leaks—indeed, as late as December 1970 the wiretap produced solid leads to potential leaks by others—this Court must conclude that continuing the wiretap out of a concern with leaks would not have fallen "outside the range of the professional competence expected of" a government official charged with investigating leaks in 1969–1970. *Malley v. Briggs,* 475 U.S. 335, 346 n. 9, 106 S.Ct. 1092, 1098 n. 9, 89 L.Ed.2d 271 (1986).

*The reasonableness issue*

11. The court of appeals also requires this Court to reconsider whether the Halperin wiretap violated established reasonableness requirements for the purpose of determining defendants' liability under the Fourth Amendment. In other cases

the Court of Appeals has held that national security wiretaps conducted contemporaneously with this one were not governed by clearly established constitutional standards. *See, e.g., Zweibon IV,* 720 F.2d at 170 (*see supra* note 5). When this case last was before this Court, Judge Smith had relied on the court of appeals' pronouncements in these cases to conclude that claims of unreasonableness were insufficient to defeat defendants' entitlement to qualified immunity. *Halperin v. Kissinger,* 578 F.Supp. 231, 234 (D.D.C.1984). This was reversed after the panel majority concluded that the court of appeals' earlier decision on this point constituted the law of the case. *Halperin II,* 807 F.2d at 194–97 (concurring op.). In *Halperin I,* the court had affirmed without discussion (606 F.2d at 1205–06) Judge Smith's initial ruling that the Halperin wiretap was governed by "the 'particular, precise, and discriminate' procedures required by the Supreme Court in numerous Fourth Amendment cases" (424 F.Supp. at 843), such as *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). This is the law of the case which must be applied in considering defendants' motion for summary judgment.

■ 12. Although *Halperin II* holds that the Halperin wiretap must be judged by the established standards of 1969–1971, the court of appeals provided no additional guidance as to what those standards were. Assuming that reasonableness standards developed for criminal investigative wiretaps must be applied here, this Court finds it appropriate to look to the Supreme Court's opinion in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), which expands on what was said in *Berger.* The Court in *Scott* stressed that "[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." 436 U.S. at 139, 98 S.Ct. at 1724. This is relevant in considering the requirement of minimization. "Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case." *Id.* at 140, 98 S.Ct. at 1724. Accordingly, "blind reliance on the percentage of nonpertinent calls intercepted" should be avoided. *Id.*

> Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

*Id.*

13. A circumstance relevant to this case is that this was a national security wiretap which necessarily is often less precise than a wiretap used to investigate ordinary crime. *See Keith,* 407 U.S. at 322, 92 S.Ct. at 2139; *accord Chagnon v. Bell,* 642 F.2d 1248, 1262 (D.C.Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). For example, national security investigations are as much concerned with "prevention of unlawful activity" as with prosecution. *Keith,* 407 U.S. at 322, 92 S.Ct. at 2139. This certainly is true with leaks of classified information, which present special problems for the investigator. Minimization may not be possible "because the government agents could never be sure whether a particular caller would reveal that he was a source [or a recipient of leaked information] sometime during his conversation" or whether there might be "code language or oblique references" pertinent to the investigation. *United States v. Truong Dinh Hung,* 629 F.2d 908, 916–17 (4th Cir.1980), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982). The monitor's ability to minimize nonpertinent calls becomes even more difficult when the wiretap is prompted by numerous leaks of highly sensitive foreign policy and military information. In that situation, the monitor—who normally would not be privy to such closely held policies and initiatives—often would not have the background and experience to distinguish with precision between a leak of insider information and an expression of opinion on a matter of topical concern (such as SALT or Vietnam).

14. The Court concludes that the Halperin wiretap was reasonable by these standards. The supervisor of the monitoring operation instructed his monitors to focus on matters that were the subject of leaks, such as Vietnam, Cambodia and SALT, and contacts and activities that might have a bearing on a subject's motivation to leak. Further minimization was accomplished by the use of summary letters, which omitted the great majority of conversations that were overheard and logged. Plaintiffs argue that the unreasonableness of the way in which the wiretap was conducted is demonstrated by the fact that political and personal conversations were logged and in some instances reported in the summary letters, but this argument must be rejected. These are not discrete categories. As noted earlier, a conversation about a matter having political interest may also raise legitimate national security concerns. This overlap is one reason the court of appeals in *Halperin I* expressed concern about wiretaps used in leaks investigations (606 F.2d at 1200–01), but it is not a basis to deny defendants immunity. Plaintiffs' further argument that the wiretap was unreasonable because Belter did not instruct his monitors to omit privileged communications also must be rejected because neither *Berger* nor *Scott* clearly established any prohibitions on overhearing such conversations.

*The responsibility issue*

■ 15. The qualified immunity issue addressed by the court of appeals in *Halperin II* focused on the wiretap rather than defendants' individualized roles in the wiretap. Since *Halperin II* was decided, the Supreme Court has recognized that qualified immunity also looks to the actions of the particular defendant before a court, even where the overall governmental conduct is unjustified. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034 (1987). This rule is especially appropriate here since at least one of these defendants relied on the FBI for the day to day conduct of the wiretap which plaintiffs fault. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Robertson v. Sichel*, 127 U.S. 507, 515–16, 8 S.Ct. 1286, 1290, 3 L.Ed. 203 (1888) (government officials can-

not be held liable under the doctrine of *respondeat superior*). A defendant's lack of responsibility for the continuation of the wiretap, whatever its justification, is a separate ground justifying summary judgment.

16. As to John N. Mitchell, not only did he authorize the wiretap in May 1969, but under Department of Justice procedures, the wiretap should not have been continued after 90 days, *i.e.*, mid-August 1969. Since Mitchell has died and is no longer a defendant, it is not necessary to assess Mitchell's responsibility for his failure to act on his claim of qualified immunity for the continuation of the wiretap thereafter.

17. As to Henry A. Kissinger, the documents in the record and deposition testimony indicate that Kissinger was responsible not only for giving names of persons to the FBI to wiretap but also for ending particular surveillances. He exercised his authority to discontinue certain surveillances while contemporaneously continuing the Halperin surveillance, despite observations from the FBI that the Halperin surveillance was not producing any information and should be terminated. Indeed, the *Halperin II* court observed that "Kissinger ordered that the electronic surveillance continue in the face of FBI observations in May and June of 1969 that it was fruitless, and a July 8 FBI recommendation that it be terminated." 807 F.2d at 182. In addition, on February 10, 1971, one day before the Halperin wiretap was removed, an internal FBI memorandum stated that "Colonel Alexander M. Haig of Dr. Kissinger's office has in the past indicated that they intend to take some of these [wiretaps] off." This memo shows that Kissinger controlled who was wiretapped and for how long. Kissinger's position is succinctly and directly contradicted by Mitchell's testimony: "Dr. Kissinger, having initiated the taps, [then] it would be his determination as to when they came off." We conclude that Kissinger, either alone or with others, was responsible for continuing the Halperin wiretap from May 1969 to May 1970.

18. As to H.R. Haldeman, this Court concludes that he is not responsible for the

**1550**

wiretap through May 1970. Prior to May 12, 1970, Haldeman had no responsibility for the wiretap; and consequently he cannot be held accountable for the continuation of the wiretap up to that point.

An order consistent with the foregoing Findings of Fact and Conclusions of Law has been entered this day.

### · ORDER

Upon consideration of defendants' motion for partial summary judgment, plaintiffs' opposition thereto and having heard argument thereon, and finding with respect to the Title III claim for the period (beginning with the wiretap's initiation and ending no later than May 1970), that no reasonable jury could find the wiretap's putative national security purpose objectively unreasonable and further finding with respect to the Fourth Amendment reasonableness claim that the wiretap covering the aforementioned period did not violate what the *Halperin I* court found to have been the clearly established reasonableness standards, it is by the Court this 25th day of October, 1989

ORDERED:

1. Defendant Henry A. Kissinger is awarded partial summary judgment on plaintiffs' Title III and Fourth Amendment claims, despite his participation in the continuation of the Halperin wiretap from its initiation in May 1969 through May 1970, because, entirely apart from the issue of the legality of continuing the wiretap for the aforementioned period, he is entitled to qualified immunity for his actions or failures to act.

2. Defendant H.R. Haldeman is awarded partial summary judgment on plaintiffs' Title III and Fourth Amendment claims because he was not responsible for any of the events occurring prior to May 12, 1970.

3. The claims against former defendant John N. Mitchell are dismissed.

FURTHER ORDERED that there be a calendar call on Thursday, November 2, 1989, at 1:30 p.m. to consider all remaining issues.